FILED
UNITED STATES DISTRICT COURT IN CLERKS OFFICE
**DISTRICT OF MASSACHUSETTS**

2008 NOV -7 P 4: 49

U S DISTRICT COURT

**JURY DEMANDED**

Civil Action No.:

|  |  |
|---|---|
| DEEPA SONI, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BRIGHAM & WOMEN'S HOSPITAL, INC. | ) |
| ARTHUR DAY, M.D., | ) |
| THE CHILDREN'S HOSPITAL CORP. | ) |
| MARK PROCTOR, M.D., | ) |
| President and Fellows of HARVARD COLLEGE | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**COMPLAINT**

**INTRODUCTION**

The plaintiff, Dr. Deepa Soni, is a female neurosurgeon of Indian descent. She is an American citizen, as are her parents. As a child, Dr. Soni dreamed of becoming a neurosurgeon. Throughout her educational process she obtained the highest of academic honors. Upon graduating from medical school she entered a general surgery internship followed by Neurosurgery training in the Harvard Medical School ("HMS") / Brigham and Women's Hospital ("BWH") / Children's Hospital ("CH") Neurosurgery Residency Program.

Unfortunately however, Dr. Soni's dreams of being an academic neurosurgeon at a top tier institution were dashed by the defendants. Throughout her Neurosurgery Residency, Dr. Soni was subjected to harassment, hostility, discrimination, retaliation, and blackballing, primarily by Dr. Day, the current Chairman of Neurosurgery at BWH and the Residency Program Director for the HMS / BWH / CH Neurosurgery Residency Training Program; and secondarily by Dr. Mark Proctor, the Assistant Program Director for the Neurosurgery Residency. On numerous occasions, Dr. Soni complained to members of the Neurosurgery Department as well as to various members of the BWH, CH, and HMS Administrations, about the discrimination and retaliation to which Dr. Day and Dr. Proctor were subjecting her.

When Dr. Soni reported the discrimination and retaliation, the BWH and HMS Administration repeatedly asked her to be patient as it "would take time to work out the problems" and that she should "trust them that the problem is being taken care of." The HMS, BWH, and CH

Administrations went as far as to admit to Dr. Soni that she was indeed being subjected to discriminatory and retaliatory treatment, at the hands of Drs. Day and Proctor, yet they failed to stop this treatment or to intervene to protect her. Rather, BWH affirmatively mislead Dr. Soni that they had plans to hire her as well as made the incredible decision to promote Dr. Day to Chairman of the BWH Department of Neurosurgery, despite numerous complaints of gender and national origin discrimination and retaliation against him.

Dr. Soni is an accomplished neurosurgeon who had an exemplary record as a resident. It was her expectation that if she obtained the highest honors throughout her residency she would graduate the neurosurgery training program with a fair and equal opportunity, to that enjoyed by her white male peers, to become employed by an academic neurosurgery department in a top tier ("Tier 1") hospital facility. Dr. Soni did graduate from the HMS / BWH / CH Neurosurgery Residency Program, with the highest honors, on June 30, 2006. Dr. Soni then remained employed by BWH until the completion of her fellowship in June 2007.

Shortly prior to her graduation from the Neurosurgery Residency until well into her fellowship, the BWH Administration affirmatively mislead Dr. Soni to believe that she would be offered a neurosurgery job at BWH, upon the completion of her fellowship.   However, BWH failed to hire or even consider Dr. Soni for an open position, and instead hired another neurosurgeon with nearly identical qualifications to Dr. Soni.

Unfortunately, the discrimination and retaliation that Dr. Soni has suffered from Dr. Day, Dr. Proctor and the HMS, BWH, and CH Administrations has irreparably damaged her reputation in neurosurgery nationwide as well as stifled her chances of being hired as an academic neurosurgeon, at a Tier 1 facility.

## PARTIES

1. Plaintiff, Deepa Soni, M.D. ("Dr. Soni"), is a Massachusetts resident of Indian descent who is a board-eligible neurosurgeon and a 2006 graduate of the Harvard Medical School ("HMS") / Brigham and Women's Hospital ("BWH") / Children's Hospital ("CH") Neurosurgery Residency Training Program  .

2. Defendant, Brigham & Women's Hospital, Inc. ("BWH"), is a not-for-profit Massachusetts corporation with a principal place of business at 75 Francis Street, Boston, Massachusetts 02115.

3. Defendant, Arthur Day, M.D. is a Massachusetts resident who is the Chairman of the BWH Neurosurgery Department, Residency Program Director of the BWH/CH/Harvard Neurosurgery Program, and practices at BWH as a cerebrovascular neurosurgeon in the Neurosurgery Department ("Neurosurgery Dept.").

4. Defendant, Children's Hospital, Corp. ("CH"), is a not-for-profit Massachusetts corporation with a principal place of business at 300 Longwood Avenue, Boston, Massachusetts 02115.

5. Defendant, Mark Proctor, M.D. is a Massachusetts resident who is the Assistant Residency Program Director of the BWH/CH/Harvard Neurosurgery Program and practices at CH as a pediatric neurosurgeon in the Neurosurgery Department ("Neurosurgery Dept.").

6. Defendant, President and Fellows of Harvard College ("Harvard"), are a charitable corporation established under the laws and Constitution of the Commonwealth of Massachusetts.     Harvard is a degree-granting educational institution located in Cambridge, Massachusetts and grants degrees in, among other subjects, medicine; and operates programs certifying successful participants in a variety of medical specialties, including neurosurgery.     Harvard operates the neurosurgery training program at the defendants' Brigham & Women's Hospital and Children's Hospital facilities.

## JURISDICTION

7. This Court has jurisdiction in this case under 28 U.S.C. §1331 as Plaintiff asserts federal claims.

## VENUE

8. Venue is proper in this Court as all parties are either Massachusetts citizens or a Massachusetts corporation, and the conduct complained of took place in Massachusetts.

## FACTUAL BACKGROUND

9. Dr. Deepa Soni, is a 37-year-old female neurosurgeon of Indian descent. She is an American citizen, as are her parents. She was born in Michigan and raised in the Midwest; where she attended public schools and then went on to obtain an undergraduate degree in Cellular and Molecular Biology, from the University of Michigan, in Ann Arbor, MI, in 1993. Dr. Soni then went on to attend Howard University College of Medicine (HUCOM), graduating with top honors and a Doctorate of Medicine (MD) degree in 1998. Dr. Soni also obtained a Masters in Public Health degree from the Harvard School of Public Health in 2005, becoming the first and only neurosurgery resident at HMS / BWH / CH to ever obtain a graduate degree during neurosurgery training.

10. As a child, Dr. Soni dreamed of becoming a doctor, and knew from a very early age that she wanted to become a neurosurgeon. In fact, from a very young age, Dr. Soni spoke of her dream to be a brain surgeon at Harvard. Throughout her educational process, Dr. Soni obtained the highest of academic honors. Upon graduating from medical school she completed a general surgery internship followed by Neurosurgery Residency Training at HMS / BWH / CH.

11. Dr. Soni sought, obtained and accepted a neurosurgery residency position at HMS / BWH / CH because it is considered pre-eminent in the field. Both BWH and CH are Harvard-Affiliated Teaching Hospitals, and are among the top-rated institutions in the world. From childhood, it was Dr. Soni's dream to be a neurosurgeon, complete her training at a Harvard institution, and then to be appointed as member of the faculty in neurosurgery at BWH or an equivalent top tier academic institution.

12. In July 2000, Dr. Soni started the neurosurgery residency program at HMS / BWH / CH. Dr. Soni completed the neurosurgery residency program on June 30, 2006, and she continued to be employed by BWH until the completion of her fellowship in June 2007.

13. Dr. Soni is the 2nd woman ever to complete the neurosurgery residency program, in its entirety, at Harvard Medical School ("HMS") / Brigham and Women's Hospital ("BWH") / Children's Hospital ("CH"), in more than 70 years of the programs existence.

## Overview of Neurosurgery Training in the United States

14. Neurosurgery Residency training, as is the case with all medical and surgical residency training programs, is a period of post-graduate "on the job" specialized medical education and training.

15. A person applies and is accepted into a neurosurgery residency training program, through a process very similar to that of applying and being accepted into college or any post-graduate educational program. Successful admission or "matching" into a neurosurgery residency is based on specific qualifications including the successful completion of four years of undergraduate education and four years of medical school, medical test scores, and letters of recommendation.

16. A residency is not a job per se. Rather it is an apprenticeship completed under the supervision of an "Attending" or supervising doctor. Although neurosurgery residents are medical doctors, they cannot manage patients or perform surgeries without the supervision of an Attending Neurosurgeon.

17. Each residency training program has a Residency Program Director, who along with the Department Chairman, serves as the residents' "boss." In addition, the Residency Program Director oversees all of the educational activities of the residents.

18. Residents are paid a minimal fixed salary or stipend for the duration of their training. The salaries are fixed, non-negotiable, and the same for residents at the same level, across all specialties (i.e. a 1st year neurosurgical resident and a 1st year psychiatry resident make the same salary).

19. Residency training programs vary in length according to the specialty. The shortest residencies are three years long and the longest ones are seven years in length. Neurosurgery residency programs are among the longest of all medical specialties, lasting an average of seven years.

20. There are currently 97 accredited neurosurgery training programs in the US (American Board of Neurological Surgery [ABNS]), with approximately 1300 neurosurgical residents in these programs (American Association of Neurological Surgeons [AANS] membership website: http://www.aans.org/about/membership/aans.asp).

21. Obtaining a neurosurgery residency position is extremely competitive, with an average of only 50-60% of medical students applying to neurosurgery and matching into a residency program (AANS website: http://www.aans.org/about/membership/aans.asp).

22. Neurosurgery residency training is long and gruelling. The HMS / BWH / CH neurosurgery residency is a seven year training program, as are the majority of neurosurgery residency programs in America.

23. Historically, neurosurgery residents regularly worked more than 100 hours in a typical work week. In 2004, the American College of Graduate Medical Education ("ACGME") mandated that all US medical residents work a maximum of 80 to 88 hours per week (http://www.acgme.org/acWebsite/RRC_160_news/160_news604.pdf).

24. Once a doctor enters a neurosurgery residency, it is expected that he / she will graduate the residency from the same institution, as there is little to no lateral movement in residency programs. In other words, one could not expect to leave in his/her fourth year of neurosurgery training and transfer to another institution, as such slots are rarely if ever available. When one becomes a senior or chief resident, transferring to another neurosurgery residency program is unheard of and virtually impossible.

## Women and Gender Discrimination in Neurosurgery

25. The community of neurosurgeons throughout the United States is very small. There are approximately 4,500 neurosurgeons in the United States and fewer than four percent of those neurosurgeons are women (Ex. A: WINS White Paper Committee. 2008. The future of neurosurgery: a white paper on the recruitment and retention of women in neurosurgery. Journal of Neurosurgery 109(3): 378-86.)

26. There are relatively few female neurosurgeons in the US compared to males. There are an estimated 180 certified female neurosurgeons in the US, out of the 4,500 or so total neurosurgeons (Women in Neurosurgery [WINS] Website: http://www.neurosurgerywins.org/whoweare/certified.html).

27. Of the 100 or so academic neurosurgery departments, there is only one female neurosurgeon that is a chair / chief of a neurosurgery department (Ex. A).

28. The occurrence of gender discrimination in neurosurgery is well documented (Ex. A). Gender discrimination in neurosurgery is very prevalent and widely recognized (Ex. A). In Neurosurgery, the "old boy's network" is alive and well (Ex. B: Affidavit of Ms. Lora Roberts, Neurosurgery Placement Specialist).

29. Female neurosurgeons are often held to a higher standard in qualifications, academic background, and education than male neurosurgeons. Often, this disparate treatment is subconscious and subtle (Ex. B).

30. There is a different standard of behavior between males and females in neurosurgery. When male neurosurgeons are rude, disrespectful, and temperamental, most colleagues will forgive that male neurosurgeon due to the stress and qualifications earned. When a female neurosurgeon demonstrates the same behavior, most colleagues label the females as "difficult", "not a team-player", and "not a good fit". This double-standard has jeopardized many female neurosurgeons careers (Ex. B: Affidavit of Dr. Sagun Tuli: Civil Action No.: 07cv12338; Gertner, J., MEMORANDUM AND ORDER – RE: MOTIONS FOR PRELIMINARY INJUNCTION, Civil Action No.: 07cv12338; Decision: July 2, 2008).

31. Many female neurosurgeons are subjected to discrimination and retaliation in the workplace (Ex. A; Ex. B).

32. Neurosurgery careers can be crushed in a second either for legitimate reasons such as patient safety, or non-legitimate reasons such as personality conflicts (Ex. B).

**Overview of the Neurosurgery Job Market**

33. The field of neurosurgery is very specialized and very small. Recruiting in the academic and private sector of the neurosurgery environment is a competitive and rigorous process (Ex. B).

34. The neurosurgery community across the US has fewer than 3,500 total board-certified neurosurgeons in practice, with only 400 or so academic neurosurgeons. This community is small, close-knit, and communication amongst neurosurgeons is free-flowing (Ex. A, Ex. B).

35. Typically, before a neurosurgery candidate is offered a position, the Department Chairman will call his co-chairs, colleagues, and the Residency Program Directors across the country to reference the candidate. This frequently occurs whether or not the reference was specifically provided by the candidate.

36. Due to the small size of the neurosurgery community, neurosurgeons often rely on "word-of-mouth" references more frequently than written references.

37. A neurosurgeon must be licensed in a particular state and credentialed at a specific hospital before he/she can practice. The licensing and credentialing process is lengthy and takes 9 to 12 months on average. Additionally, it takes a significant amount of time to build a neurosurgical practice, and typically takes years for a neurosurgeon to become established in a community. Therefore, neurosurgeons do not typically move around a lot and rarely change jobs during their careers.

## Overview of Neurosurgery Residency Program at HMS / BWH / CH

38. The neurosurgery training program at HMS / BWH / CH is a seven year residency program, following graduation from medical school. This is sometimes followed by an optional eighth post-graduate year ("PGY8") year in fellowship training. During Dr. Soni's PGY1 and PGY8 years, she was paid by Brigham and Women's Hospital, Inc., via the finance Department at Partners HealthCare System, Inc. During Dr. Soni's PGY2 throughout PGY7 years, she was paid by the Children's Hospital, Corp.

39. The HMS / BWH / CH Neurosurgery Residency Program ("The Neurosurgery Residency") is a combined training program between BWH and CH, both of which are Harvard Medical School teaching hospitals. During her residency Dr. Soni worked in both the Brigham and Women's Hospital and the Children's Hospital.

40. The Neurosurgery Residency accepts two residents into the program per year. Therefore, there are typically 14 neurosurgery residents in total (2 per year for years PGY1 to PGY7). When Dr. Soni entered The Neurosurgery Residency there were two other female neurosurgery residents, Dr. Claudia Martin and Dr. Malini Narayanan. Dr. Malini Narayanan was one year senior to Dr. Soni and is also of Indian descent.

41. When Dr. Soni entered The Residency in 2000, Dr. Peter Black ("Dr. Black") was the Chairman of the BWH and CH Neurosurgery Departments and remained in that position throughout Dr. Soni's residency. Additionally, Dr. Black was the Program Director of the HMS / BWH / CH Residency Program ("Program Director") until Dr. Soni's PGY4 year. The Program Director is responsible for the continued supervision of medical training of doctors, during their residency training programs.

42. In 2000, Dr. Mark Proctor ("Dr. Proctor) became the Assistant / Associate Residency Program Director for The Neurosurgery Residency, and remained in that position for the duration of Dr. Soni's residency. As part of his duties, Dr. Proctor oversaw resident

education, rotations and on-call scheduling, and other administrative tasks related to resident education. Dr. Proctor's own curriculum vita indicates he has supervisory authority over neurosurgery residents and confirms that he holds the said title.

43. Dr. Arthur Day ("Dr. Day") was hired in the spring of 2002, and became the HMS / BWH / CH Neurosurgery Residency Program Director sometime towards the end of Dr. Soni's PGY3 year.    In 2002, Dr. Day was also appointed to the position of Vice-Chairman for the BWH Department of Neurosurgery and as Chief of the Cerebrovascular Service, a subspecialty of neurosurgery as well as an area of particular interest to Dr. Soni.

## Background and Neurosurgical Power of Dr. Arthur Day

44. Dr. Day is an extremely powerful man in the field of neurosurgery, nationwide.  He currently has or has had leadership positions in many of the organizations, which support and represent neurosurgeons.  Of particular importance, Dr. Day is currently the co-Chairman of the ACGME Neurosurgery Residency Review Committee ("RRC"), the national body, which accredits new and existing neurosurgery residency training programs (Depositions of Dr. Arthur Day and Dr. Peter Black: Civil Action No.: 07cv12338; http://www.acgme.org/acWebsite/meetings/me_rrc08.asp).

45. Because Dr. Day is so powerful in organized neurosurgery and because he is the HMS/ BWH/CH Neurosurgery Program Director, there is an inherent and significant power differential between Dr. Day and the neurosurgery residents.  As a result, the residents are by definition beholden to him as their professional fate lies largely in his hands.

46. While at BWH, Dr. Day has had a number of male residents that he has treated preferentially.  These residents were referred to as "Art's Boys" by hospital staff.  It is typical for "Art's Boys" to be treated preferentially and not required to participate in the same clinical and/or on-call activities as other residents are required to do.  Additionally, "Art's Boys" felt free to be insubordinate or disrespectful to certain Attendings or other hospital staff that Dr. Day did not like (Depositions of Dr. Mark Johnson and Affidavit of Dr. Sagun Tuli: Civil Action No.: 07cv12338).

47. On information and belief, in the late spring 2007, a letter documenting Dr. Day's long history of sexist and discriminatory behavior was sent to Dr. James Mongan, Chairman of the Partner's Board (the parent Corporation of BWH), Dr. Black, and other members of the BWH Administration, protesting Dr. Day's candidacy for the Chairmanship of the BWH Department of Neurosurgery.  Despite this letter as well as Dr. Day's history of multiple complaints of sexism, racism, and discriminatory behavior, including two existing complaints with the Massachusetts Commission on Anti-Discrimination ("MCAD") as well as multiple internal complaints at the time, the BWH administration made the incredible decision to promote Dr. Day, appointing him Chairman of the BWH Neurosurgery Department in June 2007.

48. Dr. Day was to become President Elect of the American Association of Neurological Surgeons ("AANS") in April 2008, but suddenly and unexpectedly withdrew his nomination in March 2008. This withdrawal occurred very soon after his alleged unprofessional behavior as well as reports of several gender discrimination complaints and/or lawsuits that had been filed against him were widely publicized. On information and belief, the AANS leadership demanded that Dr. Day withdraw his nomination for the position of President-Elect, as they do not support discriminatory and retaliatory behavior.

## Dr. Day Has a Long History of Inappropriate and Unprofessional Behavior, Sex Discrimination and Retaliation

49. Dr. Day has a long and well-documented history of sexism, racism, discriminatory, retaliatory, unprofessional, and inappropriate behavior towards his female trainees, colleagues, co-workers, and staff. In fact, his sexism and racism have been widely-publicized over the past year, with three articles on the topic appearing in the Boston Globe alone, within the past 9 months.

50. On information and belief, Dr. Day has stated that he "did not want to dilute the field of neurosurgery by accepting women and minorities into the BWH Neurosurgery Program." (Depositions of Dr. Peter Black: Civil Action No.: 07cv12338).

51. Dr. Day has refused to hire several women and minority physicians for both residency and faculty positions in the BWH / CH Department of Neurosurgery.

52. From his arrival at BWH in 2002, Dr. Day displayed inappropriate, unprofessional, and sexist behavior and was repeatedly reprimanded by Dr. Black and others in the Neurosurgery Department for his inappropriate and unprofessional behavior (Depositions of Dr. Peter Black and Kari Peterson: Civil Action No.: 07cv12338).

53. Dr. Day has had three complaints of gender and national origin discrimination filed against him with the Massachusetts Commission Against Discrimination (MCAD), within a three year period, from 2005 to 2007. One complaint was from a Dr. Malini Narayanan in 2005. Another complaint was filed by Dr. Sagun Tuli in 2007. The third complaint was filed by Dr. Soni in 2007 (Docket Numbers, 07BEM01221 and 07BEM01219). All three aforementioned MCAD complaints named Dr. Day as a defendant.

54. In her MCAD complaint, Dr. Narayanan documented the gender and race discrimination and retaliation to which she had been subjected by Dr. Day. Dr. Narayanan settled her case against Dr. Day and HMS / BWH / CH, in February 2008.

55. In July 2008, Dr. Tuli's was granted a preliminary injunction, which enjoined BWH / Dr. Day from compelling her to undergo a mandatory psychiatric exam / fitness test. Dr. Tuli's overall discrimination / retaliation case against BWH and Dr. Day is pending before the federal court in Boston, MA, with a trial date set for January 2009 (Civil Action No.: 1:2007-cv-12338).

56. Dr. Day frequently makes comments in the workplace that are discriminatory, sexist, and racist.

57. Dr. Day, when addressing groups, often talks only to the men in the group. He will often talk about "wives" and "girlfriends" of the males, but fails to be inclusive by mentioning "husbands" or addressing issues relevant to the women.

58. Dr. Day characterized Dr. Tuli's and Dr. Odette Harris', another female neurosurgeon, interests in epidemiology as "girl's topics."

59. At a BWH graduation dinner, Dr. Day asked Dr. Tuli asked, "Sagun can you get up on the table and dance for us to show the female residents how to behave?" (Civil Action No.: 1:2007-cv-12338).

60. Dr. Day frequently uses inappropriate analogies when talking to female colleagues, specifically comparing his relationship to them like that of "lovers". For example, Dr. Day told Dr. Soni on numerous occasions "let's pretend like we are lovers and were having an affair…" Dr. Day also has told Dr. Tuli that they were "like lovers" and that she had cheated on him not listening to him and by "going after him" during rounds (Civil Action No.: 1:2007-cv-12338).

61. Dr. Day regularly makes demeaning statements to females. He often says "You are just a girl, are you sure you can do that?"

62. Dr. Day refers to female physicians by their first name or calls them "girls" in a derisive way, yet refers to male residents as "Dr. Smith" or "Dr. Jones."

63. Dr. Day touches female employees in a way that is inappropriate in the workplace. He has put his arm around female physicians, has stroked the arms and backs of nurses, and hugged women when there was no professional reason for physical contact. Dr. Day does not hug or stroke male BWH employees.

64. Another example of Dr. Day's sexism and racism was that he frequently confused Drs. Soni, Tuli, and Narayanan with one another as well as regularly called them each other's names. He also frequently compared Drs. Soni, Tuli, and Narayanan to one another despite their very different interests, personalities and backgrounds. In the same vein, when Dr. Day was upset with one of aforementioned women, he would lash out against the other two. In other words, an action by Dr. Soni, Dr. Tuli, or Dr. Narayanan would prompt a reaction towards all three women.

65. When Dr. Suzanne Tharin, a female junior resident, had problems with her interpersonal skills and communication with the nurses, Dr. Day told Dr. Soni to talk to and mentor Dr. Tharin since she was also a female. Dr. Day told Dr. Soni that she would be a good role model to Dr. Tharin since Dr. Soni understands "female issues."

## Dr. Proctor Has a History of Inappropriate and Unprofessional Behavior, Sex Discrimination and Retaliation

66. Dr. Proctor has a history of inappropriate, unprofessional, hostile and discriminatory behavior. He has been known to make openly racial slurs, including asking one resident, with an Arabic sounding name: "what's wrong with your people" and further stating: "you need to tell your people to control themselves," referring to the World Trade Center bombing on 9/11/01 and other related terrorist events during that time.

67. It was not uncommon for Dr. Proctor to violently shout at and use graphic expletives directed at patients. On information and belief, on one occasion, Dr. Proctor shouted "you fucking bitch" at a young girl he was operating on, when he was frustrated during a portion of the operation. On information and belief, the other personnel in the operating room were offended and appalled by such unprofessional behavior.

68. Dr. Proctor had double standards when it came to men and women trainees, and he regularly treated the male and female residents differently. For example, Dr. Proctor chastised a female resident, Dr. Narayanan, for "complaining" when she voiced her concerns on clinical and other resident issues, even though these issues raised were in direct response to Dr. Proctor's solicitation for feedback on such issues. On the other hand, Dr. Proctor praised a male resident, Dr. Chima Ohaegbulam, for raising the same issues as Dr. Narayanan, lauding him for his leadership and initiative for addressing such important issues.

69. Dr. Black told Dr. Soni on many occasions that Dr. Proctor "has it out for you." Dr. Black said that such targeting of a resident was unacceptable and that he had spoken to Dr. Proctor about this.

70. Dr. Proctor is very vindictive. When Dr. Soni objected to his unfair treatment of her and his hostility towards her, he became very angry. He was on a mission to defame her. On information and belief, Dr. Proctor widely publicized that Dr. Soni was "manipulative" and "did not pull her weight" as a resident.

71. When Dr. Day arrived at HMS / BWH / CH, Dr. Proctor immediately went to Dr. Day attempting to defame Dr. Soni's reputation as well as bias Dr. Day against Dr. Soni. From their initial reactions, Dr. Day would refer to emails and conversations that only Dr. Proctor had been privy to, waring Dr. Soni "to stop complaining about disparate treatment" and "stop writing emails claiming that you have been treated differently."

72. As evidenced by her evaluations and feedback from Dr. Black, many attendings would say that "I have no problem with Dr. Soni, but I hear from Dr. Proctor and/or Dr. Day that she is manipulative or not a team player."

73. In 2003, Dr. Proctor and Dr. Day asked Dr. Tuli to be part of a meeting with Dr. Soni that took place to discuss her complaints about a "hazing" and intimidation incident that she had been subjected to by one of her co-male residents. Dr. Proctor suggested that Dr. Tuli take part in this meeting as she was also a woman and a minority. However, Dr. Tuil was stifled and her recommendations for professionalism training were marginalized and ignored, despite the fact that she was the Professionalism Officer / Liaison for the Department of Neurosurgery.

## HMS / BWH / CH Have A Long History of Gender and National Origin Discrimination and Failure to Train Supervisors

74. HMS / BWH / CH have a long and widely publicized history of gender and race discrimination, with at least 5 gender and/or national origin discrimination lawsuits, specifically naming one or all of the defendants, having been filed in either MA state or federal court, within the past 18 months.

75. BWH itself has acknowledged that it has a significant problem with discrimination and harassment and has indicated that since 2001, "there have been numerous internal complaints from employees and professional staff, which have resulted in 26 claims alleging harassment and discrimination filed with the Massachusetts Commission Against Discrimination (MCAD) or the EEOC." (Ex. C: Whittemore, Anthony. The Impact of Professionalism on Safe Surgical Care, Distinguished Address, New England Society for Vascular Surgery, September 23, 2006, Boston, MA).

76. In March 2008, Dr. Carol Warfield ("Dr. Warfield"), an anesthesiologist at Beth Israel Deaconess Medical Center (BIDMC) and professor at HMS, filed a gender discrimination / retaliation lawsuit. In her lawsuit, Dr. Warfield specifically named Harvard Medical Faculty Physicians; Dr. Josef Fischer, and other members of the BIDMC Leadership, for the discrimination and retaliation she had suffered while at BIDMC, a Harvard-affiliated hospital and program. Dr. Warfield's case is currently pending before the Suffolk Superior Court (Docket No. SUCV2008-01067). Of note, Dr. Josef Fischer was forced to resign as the BIDMC Chief of Surgery, in July 2008.

77. In 2007, Dr. Sagun Tuli ("Dr. Tuli"), a BWH neurosurgeon and Assistant Professor at HMS, filed an MCAD complaint for gender and national origin discrimination and retaliation she has suffered while at BWH and HMS. In 2007, Dr. Tuli filed a gender and national origin discrimination lawsuit in Boston, MA federal court (Civil Action No.: 1:07-cv-12338). In July 2008, Dr. Tuli's was granted a preliminary injunction, which enjoined BWH / Dr. Day from compelling her to undergo a mandatory psychiatry exam / fitness test. Dr. Tuli's overall discrimination / retaliation case against BWH / Dr. Day is

pending before the federal court in Boston, MA, with a trial date set for January 2009 (Civil Action No.: 1:2007-cv-12338).

78. In 2005, Dr. Malini Narayanan ("Dr. Narayanan"), an HMS / BWH / CH neurosurgery resident, filed an MCAD complaint for gender and/or national origin discrimination / retaliation she had suffered while at HMS / BWH / CH. Dr. Narayanan settled her case with BWH / CH and Dr. Day in 2008.

79. In 2005, Dr. Chante Buntin-Mushock ("Dr. Buntin-Mushock"), an HMS / BWH anesthesia resident, filed an MCAD complaint for gender and/or national origin discrimination she had suffered while at BWH and HMS. In 2007, Dr. Buntin-Mushock filed a gender and national origin discrimination federal lawsuit, specifically naming HMS and BWH, Boston, MA federal court (Civil Action No.: 1:2007-cv-10667). Dr. Buntin-Muschock settled her case with BWH and HMS in 2008.

80. In 2005, Dr. Nadia Nathan ("Dr. Nathan"), a BWH anaesthesiologist and Assistant Professor at HMS, filed an MCAD complaint for gender and/or national origin discrimination she had suffered while at BWH and HMS. In 2007, Dr. Nathan filed a gender and/or national origin discrimination federal lawsuit, specifically naming HMS and BWH (Civil Action No.: 1:2007-cv-10667). Dr. Nathan settled her case with BWH and HMS, in September 2008.

81. In 2004, Dr. Rajendra Badgaiyan ("Dr. Badgaiyan"), an HMS psychiatry resident, filed an EEOC complaint for national origin discrimination and retaliation he had suffered while at HMS and one of its affiliated hospitals. In 2004, Dr. Badgaiyan filed a national origin discrimination lawsuit, specifically naming Harvard as well as faculty members of the Harvard South Shore Residency Program, in Boston, MA federal court (Case No. 04-12031 PBS). Dr. Badgaiyan settled his case with Harvard and the affiliated faculty members of Harvard South Shore Residency Program in 2008.

## Dr. Soni was an Objectively Accomplished Neurosurgery Resident

82. From the onset of her training, Dr. Soni was objectively accomplished. She worked very tenaciously and advanced with ease through the residency program, earning excellent reviews both as to her clinical abilities and interpersonal skills. In fact, she was one of the top trainees and was honored with more than 11 national and international awards within her first three years of training. Additionally, she has multiple manuscripts that have been published, are in press, or in preparation, and has presented at numerous national and international meetings over the course of her residency.

83. With the exception of Dr. Day, Dr. Proctor, and "Art's Boys", Dr. Soni was very well-like by her colleagues and co-workers. Dr. Soni was known, by medical students, residents, nurses, attending physicians, and other co-workers, to be competent, friendly, responsive, professional, an excellent communicator, compassionate, and collegial.

84. Dr. Soni's number one priority has always been her patients.  She has a long track record of conscientious, thorough and meticulous care of her patients.  Dr. Soni is very compassionate and stands out among her peers for this.

85. Dr. Soni is a gifted and competent surgeon.  She completed nearly 1100 surgical operations during her residency with no major intraoperative complications.  Her clinical and surgical skills were regularly complimented by her Neurosurgery and other Attendings, including Dr. Day and Dr. Proctor.  Prior to the commencement of the discrimination and retaliation, Dr. Day also regularly complimented Dr. Soni on her surgical skills, attention to detail, rapport with colleagues and nurses, and her excellent bedside manner.

86. Dr. Soni advanced in the program and became one of two chief residents during the 2005-2006 academic year; her seventh (PGY7) and final year ("chief residency") of The Neurosurgery Residency.

87. Throughout her Neurosurgery Residency, Dr. Soni was considered to be among the most competitive neurosurgery residents in her peer group, nationwide.  In the normal course of events, it was expected that Dr. Soni would achieve her dream of becoming a staff neurosurgeon at BWH or an equivalent top tier institution, upon graduating from the Neurosurgery Residency.

88. Dr. Soni graduated from the Neurosurgery Residency on June 30, 2006.

**Dr. Soni Suffered Disparate Treatment and Gender Discrimination at the Hands of Dr. Day and Dr. Proctor**

89. During her senior years until her graduation from the Neurosurgery Residency in June 2006, Dr. Soni was subjected to harassment, hostility, discrimination, retaliation, and black-balling, by Dr. Day, the Residency Program Director and current Chairman of Brigham and Women's Neurosurgery Department.

90. Dr. Soni was also subjected to harassment, hostility, discrimination, and retaliation by the Assistant Residency Program Director, Dr. Proctor.

91. Dr. Proctor denied Dr. Soni the same educational experiences as well as subjected her to differential treatment as compared to her male peers, including but not limited to denying her the opportunity and funding to attend scientific meetings and educational courses, denying her the same research and elective time, denying her the opportunity to use her pre-designated research time to conduct research, denying her the same vacation schedule, denying her the same call schedules, and denying her the same opportunities to go to job interviews.

92. On several occasions during her residency, Dr. Soni noticed that she was assigned more on-call duty than her male co-residents.  Dr. Soni reported to Dr. Proctor and Dr. Day a

pattern whereby she was assigned more, longer, and less favorable call schedules than her male co-workers. Dr. Day and Dr. Proctor failed to rectify this situation, and instead repeatedly told Dr. Soni to "suck it up."

93. Dr. Soni was denied the same vacation as her male co-residents as well as subjected to a different meeting/vacation/away policy than my male peers have been allowed (both my co-chief resident and former chief residents). Dr. Soni also points to a pattern whereby she was denied time off while more favorable vacation policies were applied to her male counterparts. If Dr. Soni complained regarding her schedules, she was spoken to in angry tones and told that she was not a "team-player," while her male peers were treated respectfully.

94. During her PGY6 year, Dr. Soni noted that Dr. Day treated a seventh year female Indian chief resident, Dr. Narayanan, differently and less favorably than her male co-chief resident and the other male residents. Ultimately, Dr. Narayanan was abruptly terminated from the program. Dr. Soni had worked with Dr. Narayanan for the previous six years and had always found her to be competent in the field. Dr. Soni and several others believed that Dr. Narayanan had been discriminated against.

95. During her PGY7 year, as the co-chief resident, Dr. Soni was subjected to particularly harsh discriminatory and disparate treatment.

96. During her PGY7 year, Dr. Soni was provided fewer hours in the operating room, in the critical area of cerebrovascular surgery, than her male counterparts. She, along with two previous female trainees, was deprived the same training and number of cerebrovascular cases as her male peers (both current co-chief and former chief residents).

97. During her PGY6 and 7 years, Dr. Soni was assigned to less sophisticated junior level surgical cases and menial duties, while her male co-residents enjoyed more sophisticated cases of the type suitable for residents of the PGY6 and 7 levels.

98. Dr. Soni was treated unequally with regard to 6th year personnel covering for her. She was not allowed to ask the PGY6 resident to cover for her, even though her co-chief resident was allowed to ask the PGY6 resident to cover for him and even though she was required to cover for the Chief Resident when she was a PGY6 resident.

99. During their PGY6 and PGY7 year Dr. Soni was treated differently than Dr. Johnson with respect to coverage for call schedules. Dr. Johnson was permitted, by Drs. Proctor and Day, to have a PGY6 resident and Dr. Maher cover for him, without seeking approval of the same, while Dr. Soni was required to seek approval and was often denied. Dr. Johnson's more favorable treatment regarding coverage allowed him more flexibility to attend neurosurgery meetings and interviews or to enjoy independent time.

100.      Dr. Soni was denied time off and funds to attend professional meetings while her male counterparts were allowed time off and funds to attend meetings.

101.     Dr. Soni was given a difficult time on requests for time off for job interviews. In fact, a new "interview policy" was created for Dr. Soni, while her male colleagues were not subjected to the same or any interview policy.

102.     Dr. Soni was excluded from department luncheons, meetings, and social gatherings attended by male residents. Drs. Narayanan and Soni (two of the three female trainees as well as the only two senior and only two Indian female neurosurgery trainees at the time) were the only two residents to be excluded from an important ACGME Residency Review Committee (RRC) meeting, when they were both senior residents. On information and belief, all other residents, including junior male residents, were invited to this meeting.

103.     Dr. Day interfered with Dr. Soni's research, which is very important for advancement at teaching hospitals and academic appointments. Dr. Soni was subjected to different research policy than her male counterparts. She was required to acquire her own funding for research projects, while her male peers were given departmental funds. In fact, Dr. Day threatened Dr. Soni that she would not be allowed to carry out her research elective if she did not obtain her own funding.

104.     Dr. Soni was denied the opportunity to go to a board exam preparation course, while her male peers were funded and given time off to go.

105.     Dr. Soni was required to do more and longer rotations in the Intensive Care Unit (ICU) than her male peers, thereby precluding her the same opportunity to partake in surgical procedures as her male colleagues.

106.     Dr. Soni was required to use her vacation time for academic activities, when her male peers were given extra time off.

107.     Dr. Soni was excluded from department events and social gatherings (softball, "changing of the guard" party). Her male colleagues were regularly invited to baseball games, receiving Dr. Day's season tickets as a gift. After years of being excluded, Dr. Soni finally requested that she also be offered the baseball tickets, as her male peers had been offered the tickets on numerous previous occasions.

108.     Dr. Soni was denied the opportunity to go to job interviews, while her male counterparts were allowed to do so. Dr. Proctor and Dr. Day subjected Dr. Soni to a different "away policy" than her male colleagues. In fact, Dr. Proctor went as far as to create a new policy for Dr. Soni's job interviews, requiring unrealistic notification times, etc. Specifically, Dr. Soni to give thirty days notice of any interviews, something not required of any prior residents. Ultimately, Dr. Soni had to gain permission through the chief medical officer to go to job interviews.

109.     Drs. Narayanan and Dr. Soni (two female residents at the time) were threatened, verbally and in writing, to be terminated from the program if they failed their board exams. On information and belief, none of the male residents received similar threats.

These threats were made despite the facts that Dr. Soni's upcoming exam was just a "practice exam" and not for credit, and despite the fact that there was no precedent or existing department policy on this matter.

110.    Dr. Soni received falsely negative evaluations (for the first time in her training), with Dr. Day giving her an overall "satisfactory" performance mark, despite the fact that she had been given "outstanding" marks in the raw data/evaluations by the other faculty; whereas, several male residents were given "excellent" marks by Dr. Day, despite being given "satisfactory" or even "unsatisfactory" marks by other attendings.

111.    Dr. Soni was denied funding to attend the 2006 AANS Annual Neurosurgery Meeting while her male co-chief resident, Dr. Ian Johnson, was promised, by Dr. Day and Dr. Proctor, that his expenses would be covered. When Dr. Soni learned of this disparate treatment, she raised the issue with Drs. Day and Proctor. Dr. Day justified his funding of Dr. Johnson's attendance and travel, stating that "Dr. Johnson needed encouragement to attend such meetings" and that funding him was a way of encouraging him. Subsequent to Dr. Soni's complaint of this disparate treatment, a new department policy was introduced, whereby chief residents would be funded to attend one nationally organized neurosurgery meeting per year, and Dr. Soni was reimbursed for a portion of her travel to the meeting.

112.    Dr. Soni was denied the opportunity to attend the 9th International Pituitary Congress, an international Scientific Meeting, and present two "platform" presentations, even though the Neurosurgery Resident meeting policy clearly states that time off will be allowed (i.e. not counted as vacation time) to attend meetings at which residents have "platform" presentations. Given that Dr. Soni had two platform presentations to present she was required to use her vacation time Dr. Soni's male colleagues were not required to use their vacation time to attend scientific meetings or conferences, but rather were given additional time off to attend meeting at which they had presentations.

113.    Dr. Soni was required to personally fund her attendance at the 9th International Pituitary Congress, even though the meeting policy clearly states that funding will be provided to attend meetings at which residents have "platform" presentations. Dr. Soni's male colleagues were not required to fund their attendance at scientific meetings or conferences, but rather were provided funding by the Neurosurgery Department.

114.    In 2005, Dr. Soni was denied the opportunity to attend the AANS Annual Neurosurgery Meeting, while a male, junior PGY2 resident was not only allowed to attend the meeting (despite the fact that he did not have a "platform" presentation and thus did not fulfil the requirements of the Dept. meeting policy), but also was given extra time off (non-vacation time) and reimbursed for all of his meeting/travel expenses, by Dr. Day.

115.    In 2005, Dr. Soni was denied the opportunity to attend the Research Update in Neuroscience for Neurosurgeons (RUNN) educational course, while several of her male colleagues were provided funding and time off to attend this course.

116.     Dr. Soni was required to work more than 110 hours per week, on several occasions, while my male peers were required to work fewer hours.

117.     Dr. Day and Dr. Proctor overtly excluded Dr. Soni from meetings regarding service and chief resident issues, even though she was one of the chief residents.   The scheduling of such meetings was accommodated to include Dr. Johnson's schedule only, despite the fact that Dr. Soni was also a chief resident.

118.     Dr. Soni was required to do more call during her "protected" research time, than her male counterparts.

119.     Dr. Soni was forced to perform more clinical duties during her research time, while her male peers had far fewer or no interruptions to their research time.

120.     It became clear during Dr. Soni's PGY7 year that Dr. Johnson was treated more favorably than Dr. Soni. Dr. Johnson worked fewer, but more sophisticated calls than Dr. Soni and Dr. Johnson had his pick of vascular cases.

121.     Attendance at neurosurgery meetings during PGY6 and PGY7 is critical because it is understood that such meetings are where employment contacts are made, a fact recognized by Dr. Proctor.  As a result of scheduling issues, which disfavored Dr. Soni, Dr. Soni missed the opportunity to attend the majority of the Congress of Neurological Surgeons annual meeting, which took place between October 8 and October 13, 2005, which ironically was in Boston. Then in February of 2006, she missed the opportunity to attend the AANS/CNS Cerebrovascular section meeting because of scheduled, a key conference where residents set up interviews.

122.     Dr. Soni's clinical schedule was much more demanding than that of Dr. Johnson. Dr. Soni was required to round in the ICU for 6 months, with the assistance of only one intern, while Dr. Johnson was given a whole team of residents to help him when he was in charge of the ICU.

123.     On June 30, 2006, Dr. Day discriminated against Dr. Soni at her own graduation ceremony when he allowed her only 5 to 10 minutes to deliver her graduation speech, but allowed Dr. Johnson, her male co-chief resident and the only other graduate, to talk for nearly 45 minutes.  Dr. Johnson was allowed to give a full slide show during his speech, while Dr. Soni had not been offered the same opportunity as her male peer.

124.     Dr. Soni has been damaged professionally, emotionally and financially by the Defendants' discrimination.

**Dr. Soni was Subjected to Harassment, Hostility, and Intimidation by Dr. Day and Dr. Proctor For Reporting Disparate Treatment**

125.     After Dr. Soni reported her claims of disparate treatment to her superiors, she was treated with even more hostility by Dr. Day and Dr. Proctor.

126.     On one occasion, Dr. Day demanded that Dr. Soni "stop writing emails and letters stating that you [Dr. Soni] have been treated differently from your male peers." Dr. Day threatened Dr. Soni that she would create enemies and alienate herself from her co-residents if she "complained about discrimination."

127.     Dr. Day instructed Dr. Soni to refrain from going to Human Resources with a complaint that she had been subjected to harassment, a hostile work environment, and intimidation by some of her male co-residents ("Art's Boys"). Dr. Day threatened Dr. Soni, telling her that: "there would be adverse consequences" for her, if she complained to HR about this incident.

128.     When Dr. Soni complained in writing about intimidating and harassing treatment from one of her male co-residents, Dr. Day said "you should not have put it in writing, now I have to waste my time to look into it and will be forced do something about it."

129.     When Dr. Soni complained about a hazing incident she had suffered at the hands of one of her male co-residents, Dr. Day and Dr. Proctor told her that she was not a "team player" and had created an air of paranoia and unrest among the whole resident team. They went on to tell her that "all the residents were mad at her" because she had complained about this incident in writing, and that all residents were now "fearful that you [Dr. Soni] will go after them, too."

**Internal Complaints Within the Department of Neurosurgery**

130.     When Dr. Soni suspected that she was being subjected to disparate treatment, harassment, and intimidation she approached her Attendings, the Neurosurgeons in the Department who were directly responsible for her education and training, for help.

131.     Many of Dr. Soni's Attendings were appalled and disgusted to learn of the discriminatory treatment to which she and Dr. Narayanan had been subjected. However, several of them told her to 'grin and bear it' and to not go forward with any formal complaints in that Dr. Day was very powerful and could hurt her career.

132.     One of Dr. Soni's Neurosurgery Attendings and advisors, Dr. Robert Friedlander, admitted that she had been treated unfairly by Dr. Day, but warned her to be careful about challenging Dr. Day as he was very powerful, a megalomaniac, and would likely hurt her if she contested his treatment of her. Dr. Friedlander went on to illustrate how malicious and controlling Dr. Day was, describing that Dr. Day went as far as to take away his [Dr.

Friedlander's] own direct phone line, so that Dr. Day could control all incoming cerebrovascular referrals like "big brother".

133.     Dr. Soni especially sought out the advice of the female Attending Neurosurgeons in the department. Dr. Goumnerova was one of those people that Dr. Soni consulted with on a regular basis, seeking her guidance on how to deal with the discrimination that she was facing. Dr. Goumnerova had also been an advisor to Dr. Narayanan on such issues. When Dr. Soni would describe the discriminatory treatment that she was suffering, Dr. Goumnerova would listen intently and shake her head in disgust. Dr. Goumnerova attempted to support Dr. Soni by inviting her to her house and out to dinner during which times she would encourage Dr. Soni to "hang in there" and to "grin and bear it". However, she urged Dr. Soni to keep quiet and strongly advised her against filing a formal grievance, as Dr. Day would likely retaliate against her from doing so.

134.     Dr. Soni also went to Dr. Tuli for advice about the discrimination that she was suffering as a result of Drs. Day and Proctor. Dr. Soni especially sought out Dr. Tuli, not only because she was a female Attending Neurosurgeon but more importantly because of Dr. Tuli's position as the "Department Liaison to the Professionalism Committee". Dr. Tuli was deeply disturbed upon learning of the disparate treatment and harassment to which Dr. Soni was being subjected. Dr. Tuli told Dr. Soni that she wanted to help stop such treatment, but that she herself was fearful of Dr. Day's retaliation and that her input on such matters was not taken seriously, despite her position as the Department 'Professionalism' Officer. She then recommended that Dr. Soni document talk to Dr. Black, the Department Chairman.

135.     When Dr. Day deprived Dr. Soni of her cerebrovascular training experience, Dr. Soni sought the advice of Dr. Dong Kim, one of the other cerebrovascular attending neurosurgeons. Upon learning of this disparate treatment, Dr. Kim agreed that Dr. Day had deprived Dr. Soni of her cerebrovascular experience, and offered to talk to Dr. Day about this. On a follow-up discussion, Dr. Kim informed Dr. Soni that Dr. Day had become very angry, defensive, and hostile with him [Dr. Kim] when he discussed the disparate treatment that Dr. Soni had suffered. Dr. Kim then subsequently advised Dr. Soni to write a formal letter to Dr. Day, documenting that she had been denied the same educational experience as her male colleagues. Dr. Soni wrote a draft letter and showed it Dr. Kim, who approved it before Dr. Soni submitted it to Dr. Day. Dr. Kim also advised Dr. Soni to talk with Dr. Black, the Department Chairman about this disparate treatment.

136.     Dr. Soni also reported the discriminatory treatment to which she was subjected to the Neurosurgery Education Coordinators, who were administratively in charge of the residents. One of the Education Coordinators, Ms. Tabaitha LaPointe, frequently and regularly told Dr. Soni that it "was unfair and disturbing that Dr. Day treated her differently than her male co-residents." Another Education Coordinator, Ms. Kiki Kanianu repeatedly told Dr. Soni that Dr. Day showed favoritism to the male residents and displayed sexist and racist behavior to non-white and female residents, staff, and other member of the department.

137.     When Dr. Soni reported the discrimination and retaliation to which she was being subjected by Drs. Proctor and Day to Dr. Black, he was disgusted by Dr. Soni's accounts and told her that this type of behavior was intolerable and reassured her that he would investigate the situation.

138.     Dr. Black told Dr. Soni on many occasions that Dr. Proctor "had it out for her [Dr. Soni]". Dr. Black said that Dr. Proctor was unfairly targeting her and that he would discuss it with Dr. Proctor.

139.     On information and belief. Dr. Black reprimanded Dr. Day, on several occasions, for his discriminatory and retaliatory behavior against Dr. Soni. This in turn prompted Dr. Day to become very angry, defensive, and in fact retaliatory towards Dr. Black.

140.     Dr. Soni was very fearful to report the discriminatory treatment outside of the Department of Neurosurgery, for fear of being fired. As a senior neurosurgery resident, Dr. Soni had no option to transfer to another program.

## Dr. Day and Dr. Proctor Retaliate Against Dr. Soni For Reporting Discrimination

141.     After Dr. Soni raised concerns that she was being treated differently than her male colleagues, Dr. Proctor labelled Dr. Soni as "manipulative" and as a "complainer." Dr. Proctor repeatedly bad mouthed Dr. Soni to the male residents, inciting them and telling them that she was trying to serve her own self-interests by complaining about them. This lead to increased hostility toward Dr. Soni and a "mobbing" mentality. "Mobbing is a collective campaign by co-workers to exclude, punish, and humiliate a targeted worker. Mobbing is initiated most often by a person in a position of power or influence, and is a desperate urge to crush and eliminate the target" (Westhues Kenneth. 2002. AT THE MERCY OF THE MOB. A summary of research on workplace mobbing published in OHS Canada, Canada's Occupational Health & Safety Magazine, Vol. 18, No. 8, pp. 30-36).

142.     Dr. Proctor socialized with the male residents and created a "fraternity" club-like atmosphere, where he would take the male residents out for drinks. and inappropriately disclose to them private subject matter that Dr. Soni had discussed with him, in his capacity as the Assistant Program Director.

143.     Several of Dr. Soni's co-male residents participated in a collective mobbing campaign against her. In addition to routine intimidation tactics, several of Dr. Soni's co-male residents threw away her research data. books and several of her personal belongings simply and even went as far to cut the cord of her space heater. simply just to harass her.

144.     During the 2004-2005 academic year, Dr. Soni was rejected from multiple fellowships despite the fact that she was one of the most competitive candidates on a

national scale (objectively and subjectively as quoted by multiple Neurosurgery Chairmen), and despite the fact that she was heavily recruited by the top programs, and on the "short list" for every fellowship for which she applied. These rejections occurred after Dr. Soni had complained about the disparate treatment to which she was being subjected by Dr. Proctor and Dr. Day as well as after references were sought from Dr. Day.

145.    In November 2004, Dr. Soni was told during a fellowship interview, that Dr. Day had failed to provide her a positive verbal reference even though he had provided a positive written reference for the fellowship. In fact, Dr. Day denied having worked with Dr. Soni, despite the fact that she had just completed nearly six months of working with him in the operating room during which time he supervised her directly and regularly complimented her on her clinical and surgical skills.

146.    In early 2005, Dr. Day fired Dr. Malani Narayanan, a female resident of Indian descent, five months before her graduation from the 7-year Neurosurgery residency at HMS / BWH / CH.

147.    Dr. Soni openly supported Dr. Narayanan when she was terminated, as Dr. Soni believed that Dr. Narayanan had been discriminated against by Dr. Day and Dr. Proctor. Dr. Proctors' and Dr. Day's hostility towards and retaliation against Dr. Soni increased after she supported Dr. Narayanan.

148.    Dr. Tuli also openly supported Dr. Narayanan when she was terminated, as she also felt that Dr. Narayanan had been the victim of race and gender discrimination by Dr. Day. Dr. Day then also retaliated against Dr. Tuli for her support of Dr. Narayanan (Civil Action No.: 07-cv-12338).

149.    During Dr. Soni's PGY6 and PGY7 years of residency training, Dr. Day gave Dr. Soni negative performance evaluations, despite years of high recommendations and evaluations of her work. Dr. Day gave Dr. Soni negative performance evaluations *after* Dr. Soni reported claims of discrimination against Dr. Day.

150.    The Defendant's have failed to provide Dr. Soni with copies of her performance evaluations as well as failed to provide her complete personnel record. This is despite Dr. Soni's right to these items including her written statutory request for the same.

151.    Dr. Soni has had numerous fellowship and job opportunities abruptly truncated, after potential employers spoke with Dr. Day. In fact, she had received initial offers for many of these jobs and was in discussion of terms with certain institutions, when these opportunities were withdrawn after communication with Dr. Day.

152.    Multiple job prospects abruptly truncated (even those that were very interested in me and in which I was very far along in the process / interview cycle), all subsequent to either Dr. Day learning of the specific programs to which I was considering and/or subsequent to the programs contacting the Program Director for a reference.

153.    Dr. Day provided negative verbal references of Dr. Soni, despite the fact that he had written positive references of her during the same period.

154.    Despite the difficulties in scheduling, Dr. Soni had nearly a dozen job interviews and call back interviews, during her PGY 7 year, during which the interviewers expressed profound interest in her and actively recruited her. However, as soon as the potential employers called Dr. Day, any interest in Dr. Soni abruptly stopped.

155.    Dr. Soni requested letters of recommendation from Dr. Day; however, he did not provide her letters for positions at top tier institutions, but rather only wrote her letters for second tier or lower facilities. Dr. Soni has requested copies of letters to the Tier 1 institutions, but the Defendant's have refused to provide the same.

156.    In fact, Dr. Soni received initial verbal and written offers for many of these jobs and was in final discussion of terms with several institutions, when these opportunities were withdrawn after communication with Dr. Day. On information and belief, Dr. Day spoke to majority of Dr. Soni's potential employers. These potential employers included Tier 1, 2, and 3 facilities.

157.    Dr. Day blackballed Dr. Soni from academic neurosurgery and the neurosurgery job market.

158.    From May of 2005 to present, Dr. Soni continually requested a neurosurgery staff position at BWH, but was repeatedly denied, even when there were available opportunities at her level of qualification.

159.    Dr. Johnson, Dr. Soni's male co-resident, was offered an attending position with BWH during their chief year, which he declined. Records will indicate that Dr. Johnson did not share Dr. Soni's academic credentials or honors.

160.    Despite her stellar academic and clinical record and despite the fact that she was objectively among the most competitive neurosurgery residents in the country, Dr. Soni was only able to obtain employment in a third tier neurosurgery department, upon her graduation from HMS / BWH / CH.

161.    Dr. Soni has been damaged professionally, emotionally and financially by the Defendants' retaliation.

**Retaliation for Reporting Patient Safety Issues and Unsafe Clinical Practices**

162.    In 2004, the ACGME mandated that residents in all fields could not work more than 80 hours per week. This mandate arose as work weeks in excess of 80 hours were deemed to be unsafe for both the residents as well as the for the patients of which they took care.