See the Editorial in this issue, p 377.

J Neurosurg 109:378–386, 2008

# The future of neurosurgery: a white paper on the recruitment and retention of women in neurosurgery

WINS White Paper Committee: Deborah L. Benzil, M.D.,[1] Aviva Abosch, M.D., Ph.D.,[2]
Isabelle Germano, M.D.,[3] Holly Gilmer, M.D.,[4] J. Nozipo Maraire, M.D.,[5] Karin Muraszko, M.D.,[6]
Susan Pannullo, M.D.,[7] Gail Rosseau, M.D.,[8] Lauren Schwartz, M.D.,[9]
Roxanne Todor, M.D.,[10] Jamie Ullman, M.D., and [11]Edie Zusman, M.D.[12]

[1]New York Medical College, Hartsdale, New York; [2]University of Minnesota School of Medicine, Minneapolis, Minnesota;
[3]Mount Sinai School of Medicine, New York, New York; [4]Wayne State University School of Medicine, Detroit, Michigan;
[5]Sky Lakes Medical Center, Klamath Falls, Oregon; [6]University of Michigan Medical School, Ann Arbor, Michigan; [7]New
York Presbyterian Hospital, New York, New York; [8]Chicago Institute of Neurosurgery and Neuroresearch, Chicago, Illinois;
[9]Metropolitan Medical Center, New York, New York; [10]State University of New York Downstate Medical Center, Brooklyn,
New York; [11]Elmhurst Hospital Center, Elmhurst, New York; and [12]Sutter Neuroscience Institute, Sacramento, California

*Preface.* The leadership of Women in Neurosurgery (WINS) has been asked by the Board of Directors of the American Association of Neurological Surgeons (AANS) to compose a white paper on the recruitment and retention of female neurosurgical residents and practitioners.

*Introduction.* Neurosurgery must attract the best and the brightest. Women now constitute a larger percentage of medical school classes than men, representing approximately 60% of each graduating medical school class. Neurosurgery is facing a potential crisis in the US workforce pipeline, with the number of neurosurgeons in the US (per capita) decreasing.

*Women in the Neurosurgery Workforce.* The number of women entering neurosurgery training programs and the number of board-certified female neurosurgeons is not increasing. Personal anecdotes demonstrating gender inequity abound among female neurosurgeons at every level of training and career development. Gender inequity exists in neurosurgery training programs, in the neurosurgery workplace, and within organized neurosurgery.

*Obstacles.* The consistently low numbers of women in neurosurgery training programs and in the workplace results in a dearth of female role models for the mentoring of residents and junior faculty/practitioners. This lack of guidance contributes to perpetuation of barriers to women considering careers in neurosurgery, and to the lack of professional advancement experienced by women already in the field. There is ample evidence that mentors and role models play a critical role in the training and retention of women faculty within academic medicine. The absence of a critical mass of female neurosurgeons in academic medicine may serve as a deterrent to female medical students deciding whether or not to pursue careers in neurosurgery. There is limited exposure to neurosurgery during medical school. Medical students have concerns regarding gender inequities (acceptance into residency, salaries, promotion, and achieving leadership positions). Gender inequity in academic medicine is not unique to neurosurgery; nonetheless, promotion to full professor, to neurosurgery department chair, or to a national leadership position is exceedingly rare within neurosurgery. Bright, competent, committed female neurosurgeons exist in the workforce, yet they are not being promoted in numbers comparable to their male counterparts. No female neurosurgeon has ever been president of the AANS, Congress of Neurological Surgeons, or Society of Neurological Surgeons (SNS), or chair of the American Board of Neurological Surgery (ABNS). No female neurosurgeon has even been on the ABNS or the Neurological Surgery Residency Review Committee and, until this year, no more than 2 women have simultaneously been members of the SNS. Gender inequity serves as a barrier to the advancement of women within both academic and community-based neurosurgery.

*Strategic Approach to Address Issues Identified.* To overcome the issues identified above, the authors recommend that the AANS join WINS in implementing a strategic plan, as follows: 1) Characterize the barriers. 2) Identify and eliminate discriminatory practices in the recruitment of medical students, in the training of residents, and in the hiring and advancement of neurosurgeons. 3) Promote women into leadership positions within organized neurosurgery. 4) Foster the development of female neurosurgeon role models by the training and promotion of competent, enthusiastic, female trainees and surgeons. *(DOI: 10.3171/JNS/2008/109/9/0378)*

T HE AANS Board of Directors requested that the WINS Executive Board prepare a position paper on the recruitment and retention of female neurosurgeons. In the preparation of this white paper, existing data were reviewed to evaluate the many issues relevant to recruitment, retention, and advancement. Additional resources and data-driven studies were used to help analyze the existing neurosurgical data. The following represents a summary of the crucial issues.

## Introduction

Neurosurgery must continue to attract the best and the brightest for the continued growth and viability of our profession. Once recruited, these highly talented individuals must be trained in a learning environment that demands competence, dedication, hard work, inquiry,

---

*Abbreviations used in this paper:* AANS = American Association of Neurological Surgeons; ABNS = American Board of Neurological Surgery; CNS = Congress of Neurological Surgeons; RRC = Neurological Surgery Residency Review Committee of the Accreditation Council for Graduate Medical Education; SNS = Society of Neurological Surgeons; WINS = Women in Neurosurgery.

Recruitment and retention of women in neurosurgery

and a commitment to continual improvement. Activity that merely seeks to maintain the status quo must be recognized as detrimental.

Economic forces are currently threatening academic medicine in general.[5] The challenges are increasing for both sexes. Addressing these challenges within medicine and specifically within neurosurgery is paramount for the recruitment, retention, and advancement of women. In the face of a looming crisis in the workforce, the future of American neurosurgery is inextricably linked to the development of female leaders alike.

The purpose of this white paper is to identify existing barriers to the recruitment and retention of female neurosurgeons at all levels of training and professional development and to specifically recommend feasible and rational strategies to directly address these barriers.

## Women in the Neurosurgery Workforce

### Women in Academic Medicine

The percentage of female applicants to medical school began to increase during the 1970s.[18,23] Since 1995, female applicants have consistently outnumbered male applicants and have achieved a higher acceptance rate[4] in medical school classes. Nonetheless, women continue to lag significantly within academic medicine with respect to faculty appointments, promotion, and tenure. Most striking is the lack of women in positions of leadership (professorships, deanships, and so forth), a finding that has been documented across specialties and institutions.[1,2,5,14,18-19,21,23-25,31] Women remain under-represented on professional society and editorial boards universally and are critically lacking in some specialties.[8,20,21,23,24] In addition, current studies show that, on average, women in academic medicine continue to earn at least 10% less than their male counterparts.[30,31] Encouragingly, once these disparities are recognized, targeted interventions have been shown to eliminate such inequities.[30]

Looking specifically at surgery and surgical specialties, there has also been a dramatic increase in the total number of female applicants to residencies commensurate with the increased number of women in medical school. Today, women constitute 30% of the general surgery resident population, occupy many chair positions, and hold prominent national and editorial positions.[10] It has been suggested that the workforce crisis faced by general surgery training programs during the last decade motivated these programs to implement changes necessary to attract and promote qualified women. Several surgical specialties—including orthopedics, thoracic surgery, and neurosurgery—have progressed at a much slower pace, however. In fact, the percentage of female residents choosing orthopedics is less than 1% and has not changed in 20 years![8]

Several task forces have evaluated this issue and made cogent recommendations on the factors identified as barriers to women within academic medicine and means to redress them.[3,6,11] These findings are summarized in *Appendix 1*. These task forces have all emphasized the need for active intervention and continual reanalysis of progress with necessary adjustments. A particularly insightful

analysis debunks the existence of a "glass ceiling"—that is, a deliberate and active barrier—and redefines the current challenges in terms of "cumulative disadvantages."[6] The authors also describe a closely related phenomenon of the "glass house," in which women who do progress in male-predominant arenas represent such a rarity that they are subject to great scrutiny and substantial isolation. It has been determined that any minority with fewer than 15% representation within a group has not reached "critical mass" and therefore should be defined as having "less than minority" status, as their small numbers make them function not as a minority group but rather as isolated individuals.[16] In corroboration of this thesis, Dr. Joan Venes, one of the first female neurosurgeons in the US, has remarked on her persistent feelings of isolation from the team.[27]

Key tactics for remedying this problem include the following: 1) fostering faculty diversity; 2) providing active professional development of all faculty; 3) ensuring critical assessment of institutional practices; 4) enhancing efforts to attract and recruit women to all positions; and 5) supporting programs (financially) that periodically reassess and address these issues.[1,5,7-11,17] Mentoring has also been shown to play a crucial role for trainees and, in particular, for women. Effective mentoring can result in translating potential into tangible career strides. Mentoring should thus be included as a core academic responsibility in training programs as well as in professional organizations within neurosurgery.

While many of the issues facing neurosurgery exist within academic medicine, private practice, and society as a whole,[1,2,5,9,13,17,19,29] to ignore these issues in the face of an increasingly female medical school class will jeopardize the workforce pipeline that is necessary for the survival of our comparatively small specialty.

### Workforce, Women, and Neurosurgery

Two recent articles have addressed the problems facing the neurosurgical workforce: "The Neurosurgical Workforce in North America: A Critical Review of Gender Issues"[29] and "Toward Harnessing Forces of Change: Assessing the Neurosurgical Workforce."[4] Both articles point out the growing disparity between the number of women in neurosurgical training and practice versus the number of women in the general workforce and graduating from medical school.

In 2005, >55% of students accepted to medical school were women, and female applicants to medical school have consistently outnumbered male applicants since 1995.[4] In addition, there has been a significant decrease in the overall number of neurosurgeons relative to the general population, "from 1:80,000 in 1990 to 1:91,500 in 2000."[4] This statistic suggests a shrinking supply of neurosurgeons relative to the population, despite a modest increase in the number of residency positions now available.

Woodrow et al.[29] cite a graph from *JAMA* documenting a general increase in female residents in all specialty training programs with a highly disproportionate and slower increase in female neurosurgery residents—especially when compared with general surgery. Currently,

approximately 10% of all neurosurgery residents are female[4]—a figure that has been relatively static since 1998 (Fig. 1). Similarly, the total number of female graduates from neurosurgery residencies grew steadily until 1998 but has largely leveled off since then (Fig. 2). The percentage of female resident applicants choosing neurosurgery between 1990 and 2003 demonstrates no change (0.2% of female resident applicants).

A critical statistic to consider is the number of women who are ABNS certified. Although this number grew during the decades between 1960 and 1990, this growth was not sustained after 1990 (Fig. 3).

Currently, only 5.9% of practicing neurosurgeons are women, despite the preponderance of female medical students.[4] Furthermore, the number of neurosurgeons in practice in the US has decreased.[4] In order to meet the needs of our patient population we need to continue to recruit, train, and retain the next generation of neurosurgeons. Given the realities of the workforce—that is, the preponderance of women graduating from medical school—it is imperative to identify and address the factors that are deterring women from entering or remaining in careers in neurosurgery.

## Obstacles

### Obstacles to the Recruitment of Women Into Neurosurgery

Authors of several recent studies have sought to identify the most important factors determining career choice within medicine. While it is often assumed that "lifestyle" issues are the driving force behind career selection, studies demonstrate that mentoring and the presence of role models have the strongest influence.[9,10,20,28] The gender composition of a given specialty also represents a statistically significant factor in career selection decisions made by women.[14,18,22,28]

Specifically, 80% of women polled felt that female medical students need role models of successful female faculty members. Currently in the US there are only 189 ABNS-certified female neurosurgeons, 25 full-time female academic neurosurgeons, and 1 female chair of a neurosurgery department (statistics provided by the ABNS and AANS). Globally, exposure of medical students to neurosurgery within most medical schools is limited; however, exposure of medical students to female neurosurgeons is exceedingly rare. While many male neurosurgeons have served and will continue to serve as mentors and role models for women interested in neurosurgery, studies suggest that women frequently prefer female mentors and seek to identify female role models.[6] Interest in surgery (neurosurgery) needs to be fostered early in a medical student's education.[9] For optimal efficacy, it is necessary to target recruitment efforts at 1st- and 2nd-year medical students. Significant efforts directed at medical school curriculum committees are needed. Currently, < 10% of medical students are exposed to a neurosurgery curriculum. There is a compelling need for innovative programs that expose medical students, as well as undergraduates and high school students, to the field of neurosurgery.



FIG. 1. Line graph showing the percentage of women in the population of neurosurgery residents from 1989 through 2003.

Impediments to general recruitment into neurosurgery include long working hours, length of training, and risk of litigation. Women have concerns about, and firsthand knowledge of, gender inequity in regard to salaries, academic promotion, and achieving leadership positions. Another deterrent for women is the perception among medical students that female applicants have difficulty gaining acceptance into neurosurgery residency training programs. The current San Francisco Matching Program (SF Match) database does not allow direct analysis of these data, but indirect statistics support this perception. As late as the 1990s, at least 30% of US neurosurgical residency programs had never graduated a female resident, and in 2007 there are still 4 programs that have had no female residents (see *Appendix 2*). Three programs (Case Western, Mt. Sinai, and University of Utah), representing just 2% of all residencies, have accepted > 9% of all female residents These 3, together with an additional 13 programs (representing 12% of the total programs), account for 32% of all female neurosurgeons in training. Interestingly, all but 2 (12.5%) of these 16 programs graduated their first woman prior to 1992. Gender inequity and sexual harassment during medical school rotations and residency application may discourage others.[26] Many female medical students further believe that once accepted into a neurosurgery training program they are likely to be subject to harassment and inequity. This view may be supported by medical school faculty members who do not realize that, for the most part, the neurosurgical environment has changed. Believing that they are acting in the students' best interests, medical school advisors and mentors gently guide them away from neurosurgery into other disciplines. It will, in our opinion, take an aggressive, proactive effort in recruiting female resident applicants by all neurosurgical training programs to change these perceptions. There must also be a "zero-tolerance" culture within neurosurgical departments toward harassment, unfairness, and inequity of any kind.

## Recruitment and retention of women in neurosurgery

*Obstacles to the Retention of Female Neurosurgery Residents*

Although anecdotes abound, there are no existing data on the retention of female neurosurgery residents. It has been stated that female residents drop out of training programs more frequently than their male counterparts, but no data exist to support or refute this contention. If it is true, it would be important to know if this rate were any different from the rate at which women change specialty training in general. A thorough analysis of these issues is crucial for the insight it provides into our specialty and its future. Specific recommendations to acquire this information are included in the last paragraph of this section. Ideally, exit interviews with all neurosurgery residents leaving programs—voluntarily or otherwise—should be conducted to identify what factors contribute to attrition. Additionally, confidential questionnaires to female residents currently in training would help identify important remediable problems within the work environment.

Studies demonstrate that residents learn through very different mechanisms.[6,10,17] This observation suggests that a variety of learning strategies may be necessary to achieve the intended outcome of a well-trained, competent neurosurgeon. Suitable mentoring is a crucial component for all residents but may be even more important for female residents. For many women, an important component of success, particularly during residency training, is the perception of "team spirit," with satisfaction derived as much from overall success as from individual accomplishment.[15]

*Obstacles to the Retention of Female Neurosurgeons*

The number of women in neurosurgery remains below the 15% threshold required to achieve "minority" status within a field.[16] Clearly, the total number of ABNS-certified female neurosurgeons has grown since the first woman gained certification in 1960. Overall statistics in the US reveal that only 179 (3.0%) of the 5854 ABNS diplomates are women. Of the 3545 diplomates assumed to be actively practicing, 165 (4.7%) are female. In academic neurosurgery, women account for ~ 6% of the neurosurgeons who are full-time faculty members (25 of 400) and represent 4.6% of those in private practice (145 of 3145). Specifically, review of the data (Fig. 3) demonstrates a tripling of the total number of ABNS-certified female neurosurgeons when comparing the years 1981–1990 with 1991–2000. However, over the last half-decade, this growth curve has leveled off and, in fact, the number of newly certified women has not increased during each of the last 2 decades (Fig. 3). These data do not take into account attrition due to retirement or career change.

As part of a recent internal strategic planning process, WINS conducted a "Member Needs Survey." The survey was sent to all 352 female residents and graduates of American neurosurgical residency programs via email. Of these 352 surveys sent, 152 (43%) were returned. A number of others, however, were never received due to outdated data or email filters, bringing the true response rate close to 50%. One hundred and seventy (48%) of the 352 surveys were sent to the WINS members for whom email addresses were available. Of the 152 responses, 95



Fig. 2. Line graph showing the number of female graduates from neurosurgery residencies by year.

were from WINS members (56% response rate for WINS members).

Of the respondents, many perceived that there was a "glass ceiling" (cumulative disadvantage) in academic neurosurgery (63%) and organized neurosurgery (64%), while 80% of respondents felt that women were not well represented in organized neurosurgery. Above all, 87% of respondents felt that gender inequity was present in neurosurgery. These perceptions are not unfounded, in light of the following facts. In academic medicine, 10.9% of full professorships are held by women,[7,18] whereas in neurosurgery only 6% of the faculty are women. It is unclear how many of these women hold tenure-track positions and how many are assistant, associate, or full professors. A female neurosurgeon did not become chair of an American department of neurological surgery until 2005, when Dr. Karin Muraszko was appointed chair of the Department of Neurosurgery at the University of Michigan, and Dr. Muraszko remains the only female chair of a neurosurgical department in the US. The American Academy of Neurological Surgeons voted no woman into membership until 2007 when Dr. Muraszko was voted in. No female neurosurgeon has ever been an officer of the CNS or the AANS. Until 2007, there had never been more than 2 female members of the SNS at any given time (the late 2007 elections for SNS finally broke this barrier). There has never been a female neurosurgeon as an ABNS director or on the RRC.

To date, no study has specifically addressed the issues regarding the obstacles to the retention and advancement of female neurosurgeons. It is likely that many of the issues will be similar to the factors affecting promotion within academic medicine at large (see *Women in the Neurosurgery Workforce*, above), and thus the potential strategies for improvement are likely to be similar. Unfortunately, it is unlikely that parity exists for compensation or promotion. While hard data is not currently available, rarely are women "groomed" by their chairs to become leaders locally, regionally, or nationally. Several important factors impact the ability of women to overcome this handicap. The following have been identified as the most crucial:



FIG. 3. Bar graph showing the number of ABNS-certified female neurosurgeons by decade.

• Leadership training for all neurosurgeons is lacking.

• Negotiating skills—which are critical for all new faculty and for community-based practitioners—are not a component of neurosurgery residency curricula.

Moreover, it is essential that all institutions and neurosurgery programs have clearly defined and enforced policies on sexual harassment and discrimination. Networking is an important element in job satisfaction and success. As elegantly described by Ellen Daniell in her book *Every Other Thursday: Stories and Strategies from Successful Women Scientists*,[12] it is essential to take the time to develop a cadre of advisors and colleagues who can be supportive throughout the different stages of a career. These must be individuals who are supportive but who will be honest and offer constructive criticism. Female neurosurgeons are often isolated and find it difficult to establish and maintain such a network.

A survey of all female neurosurgeons and a comparable cohort of male neurosurgeons could provide important data about equity issues including salaries and promotions. The results of such a survey would begin to answer the question of whether male and female neurosurgeons receive similar rewards for similar achievements. These data are necessary to help determine why women have not advanced into leadership positions within neurosurgery commensurate with their numbers in the profession over the last decade. In this fashion, potential obstacles to the retention of female neurosurgeons can be most appropriately addressed.

### WINS Initiatives Aimed at Recruitment and Retention of Female Residents and Neurosurgeons

Since its inception in 1989, WINS has been a women's advocacy and networking group. The goal of WINS has been to attract women to the profession and to gain recognition for female neurosurgeons who are bright, competent, and highly committed to our profession. In turn, these efforts will help to ensure the continued advancement of neurosurgery. Toward this goal, we have undertaken many independent programs, including:

A. Biannual meetings to provide education and networking opportunities.

B. "So, You Want To Be a Neurosurgeon?" brochure development and additional contributions to resident recruitment efforts (most recently in conjunction with both the AANS and CNS).

C. Resident travel scholarships to the national meetings (AANS and CNS) honoring resident academic contribution. This program has been ongoing for more than 15 years:

1. Louise Eisenhardt Resident Travel Scholarship
2. Sherry Apple Resident Travel Scholarship

D. Named lectureships honoring pioneering women in the field of neurosurgery:

1. Louise Eisenhardt, M.D.
2. Ruth Kerr-Jakoby, M.D.
3. Alexa Canady, M.D.

E. Recently developed programs, including:

1. Speaker's Bureau—to provide medical student exposure to neurosurgery: WINS is in the early stages of organizing a Speaker's Bureau to offer lectures on neurosurgery careers to medical schools. Endorsement by the AANS and CNS would go a long way in establishing this important program for recruiting the best and the brightest of both genders.

2. Mentoring Program: We have established a specialized Mentoring Program through which we will match students and residents with practicing female neurosurgeons. Dr. Roxanne Todor is the current chair of this program. Ultimately, coordination of this mentoring program with the AANS mentoring program would be optimal, allowing gender-specific mentoring if requested. In addition, the WINS mentoring program will reach out to those not yet eligible for the AANS program. Already, website development has become an integral part of this aspect of the mentoring program. A "Virtual Mentor" bulletin board is now under construction with a projected date of initiation in 2008. The bulletin board will be part of a password-protected site and designed to allow students to ask questions or express concerns and receive responses from WINS members. In addition, medical student membership in WINS is being offered without fee. Interested college students will also be welcome to join. These mentoring efforts are designed to supplement rather than substitute the ongoing national and local mentoring programs.

### Strategic Approach to Address Issues Identified

The current situation can be remedied by taking the following broad approach:

• Characterize the barriers
• Identify discriminatory practices
• Eliminate discriminatory practices
• Promote competent women into leadership positions
• Foster the development of female neurosurgeon role models and mentors

In addition, we strongly recommend that the following specific initiatives be considered as joint projects between WINS and national neurosurgical organizations:

Recruitment and retention of women in neurosurgery

A. Establishment of a program to support:

1. Annual attendance of 1–2 women neurosurgeons at the Hedwig van Ameringen Executive Leadership in Academic Medicine Program for Women (http://www.drexelmed.edu/ELAM/index.html).

2. Annual attendance of 1–2 women neurosurgeons to the Professional Development Seminar for Early Career Women Faculty (http://aamc.org/members/wim/meetings/start.htm).

3. Annual attendance of 1–2 women neurosurgeons to the Professional Development Seminar for Mid-Career Women Faculty (http://aamc.org/members/wim/meetings/start.htm)

4. Home-grown (AANS, CNS) leadership training with particular attention to areas such as negotiating skills.

B. Elimination of the registration fee for all sponsored medical students attending the AANS and CNS annual meetings. (Note: Since this paper was written, the AANS waived the registration fee at their 2008 annual meeting.)

C. Intensification of early and continuous medical student exposure to neurosurgery, including efforts such as:

1. Curriculum mandates

2. Active support of neuroscience/neurosurgery clubs

3. Innovative programs directed at medical students (as well as high schools and undergraduates):

a. Standardized talks about the spectrum of neurosurgery (such as the Gray Matter Program)

b. Neuroscience career days, invite-a-student-to-work day

c. Neuroscience fairs

d. Donation to "White Coat Ceremony" (consider laminated card with neurological exam, reflex hammer, or similar)

4. Annual "Brain-in-a-Box" programs, which would bring a local, practicing neurosurgeon to each medical school campus with a "packaged program" branded by one or more of the national neurosurgical organizations during an appropriate time, such as Brain Awareness Week.

D. Enhancement of efforts for premedical exposure to the positive attributes of neurosurgery and neurosurgeons with a goal of designing "packaged programs" suitable for students from an early age (elementary school) through college; includes neurosurgeons becoming leaders in appropriate public service programs (see above).

E. Development of a required program on diversity to be conducted in conjunction with the SNS, to include but not be limited to gender-related issues. Given the current environment of all academic medicine, we believe that such a program will be of enormous benefit to all leaders within neurosurgery.

F. Endorsement and promotion of the following attainable goals for women in neurosurgery by the AANS Board of Directors:

1. 20% of each class entering residency by the year 2012

2. 20% of all neurosurgery faculty by the year 2020

3. That progress toward these goals be regularly assessed and efforts toward them be adjusted as required

4. That the AANS promote adoption of these goals by all national neurosurgical organizations

G. Dissemination and analysis of a joint AANS/WINS survey along with utilization of a consultant to examine and provide data on the issues discussed above and progress toward redressing any problems identified.

H. Dissemination of this white paper by the AANS to appropriate organizations including the SNS, ABNS, RRC, CNS, and Council of State Neurosurgical Societies (CSNS). Establishment of a formal mechanism with WINS to engage these organizations in implementation of the above recommendations.

## Conclusions

We are concerned about the ongoing disparity between the percentage of medical students who are female and the number of women entering neurosurgery training programs and becoming ABNS-certified US neurosurgeons. The leadership of WINS would like the profession of neurosurgery to become attractive to the "best and brightest" medical students regardless of gender and to provide an atmosphere in which qualified women can flourish.

We offer concrete suggestions to characterize the barriers, identify and eliminate discriminatory practices, promote competent women, and foster development of female neurosurgeons in order to address the issues identified in this white paper. We feel strongly that more data are needed to define the problem; surveys should be directed at identifying those factors that deter women from entering neurosurgery training programs, that result in women leaving training programs, and that result in attrition of female neurosurgeons.

There already are bright, competent, and accomplished women within neurosurgery. The promotion of these women into positions of prominence within organized neurosurgery—including leadership positions within the AANS, CNS, and SNS—needs to be accelerated. Placing accomplished and competent female neurosurgeons into positions of prominence within organized neurosurgery demonstrates that female neurosurgeons are valued for their abilities within the profession. These women will then serve as mentors and role models for the recruitment and retention of subsequent female residents and practitioners.

Many of the problems addressed in this paper are not exclusive to neurosurgery or even to medicine. Studies indicate that gender issues arise at a remarkably early age[11,31] and escalate over time. It is also apparent that gender issues are magnified in environments that are traditionally male, such as neurosurgery. Furthermore, only direct acknowledgment and active efforts to address these problems will lead to durable success in their remediation. Data clearly support the critical role that leaders play in modeling behavior, and the officers of the national neurosurgical organizations are in an ideal position to help rectify the problems outlined in this paper.

We emphasize that many of the changes recommended are likely to benefit all neurosurgeons, irrespective of gender, and to ensure the viability of our specialty in the future. Given the challenges facing neurosurgery and

academic medicine in general, WINS joins with all of organized neurosurgery in the desire to see neurosurgery continue to grow and prosper.

## Acknowledgments

We gratefully acknowledge the excellent editorial assistance provided by Chris Philips and the statistical assistance provided by Mary Louise Sanderson. We also thank all of the former presidents of WINS, whose dedication and sacrifice on behalf of all women in neurosurgery made this project possible.

## Appendix 1

*Recommendations from Women in Academic Medicine, 2007 Report of the British Medical Association\**

*Appointment and promotion processes*

1.1   Both the promotions criteria and process need to be made explicit and transparent to staff.

1.2   Appraisal should be an annual process and timed to fit in with the promotion cycle.

1.3   Appointments committees should reflect the diversity of staff required (e.g., women, ethnic groups).

1.4   Diversity monitoring of equity in appointments and promotions should be in place.

*Structures, systems and activities in place regarding career progression*

2.1   Career choice, progression, and development

   2.1   Equal opportunity and diversity training should be provided.

2.2   Role models, mentoring, and networking

   2.2   Mentoring for women staff should be mainstreamed and monitored.

   2.3   Role models and networking should be recognized and encouraged.

*Organizational arrangements and cultures should encompass and ensure the following:*

3.1   Workplace and personal factors

   3.1.1   Ensure open, transparent, and fair allocation of teaching and administrative loads.

   3.1.2   Ensure administrative and committee responsibilities have fixed terms of office and are rotated so as to ensure opportunities to all staff and to avoid individuals taking on a disproportionate workload.

   3.1.3   Greater recognition needs to be given to the teaching role in undergraduate and postgraduate education.

   3.1.4   Monitor hours of work and actively discourage long hours culture.

3.2   Gender equality

   3.2.1   Measures of gender equality should be benchmarked against targets and exemplars.

3.3   Measures of esteem

   3.3.1   Journals and bodies awarding grants should take steps to minimize gender bias.

   3.3.2   Encourage leadership programs that develop and maintain skills.

   3.3.3   Recognize the value of different approaches to delivering key goals.

*Flexibility in working life: Arrangements to improve working life should include the following:*

4.1   Work-life balance

   4.1.1   Leaders of the profession and universities should visibly and vigorously support programs that encourage career progression.

   4.1.2   Promote a positive attitude to those working reduced hours

   4.1.3   Recognize and use the inherent advantages of informal flexible working in academia

   4.1.4   Forms of academic assessment and accountability should take into account LTFT working and career breaks and measure output against similar post holders.

4.2   Arrangements for flexible (LTFT) working

   4.2.1   Visible support and take-up by vice chancellors and deans.

   4.2.2   Enable a flexible career structure

4.2.3   Create opportunities for job-share in research and senior positions.

4.3   Importance of lifestyle and personal factors

   4.3.1   Encourage women to recognize the need to invest in quality child care to support their career.

   4.3.2   Seek innovative solutions to suit personal and family circumstances.

4.4   Career breaks

   4.4.1   Ensure provision of contact between staff and departments for staff taking a career break.

   4.4.2   Establish infrastructure for career breaks

\* Adapted with permission from British Medical Association (UK): *Women in Academic Medicine Report*, July 2007. London, UK: British Medical Association, 2007 (http://www.bma.org.uk/ap.nsf/content/wam2007). Abbreviation: LTFT = less-than-full-time.

## Appendix 2

*Women in US Neurosurgery Residency Programs\**

| Program | No. of Female Residents | Yrs of Graduation |
|---|---|---|
| Albany Medical College | 2 | 1989, 1998 |
| Albert Einstein/Montefiore Medical Center | 3 | 1993, 2000, 2002 |
| Allegheny General Hospital | 0 | NA |
| Baylor College of Medicine | 3 | 1999, 2005, 2008 |
| Brigham & Women's Hospitals | 8 | 1996, 2000, 2002, 2004, 2005, 2006, 2011, 2013 |
| Brown Medical School | 3 | 1994, 1999, 2012 |
| Case Western Reserve University | 12 | 1982, 1986, 1987, 1992, 1992, 1995, 1998, 1999, 2004, 2005, 2013 |
| Cedars–Sinai Medical Center | 0 | NA |
| Cleveland Clinic | 5 | 1980, 1980, 1983, 2011, 2013 |
| Columbia University/New York Neurological Institute | 6 | 1986, 1987, 2002, 2005, 2009, 2013 |
| Cornell University/Weill Medical College | 2 | 1987, 2011 |
| Dartmouth–Hitchcock Medical Center | 2 | 1986, 2007 |
| Duke University Hospital | 6 | 1982, 1984, 1985, 1987, 2002, 2012 |
| Emory University | 5 | 1980, 2001, 2007, 2010, 2010 |
| George Washington University | 6 | 1978, 1985, 1981, 1988, 2005, 2012 |
| Georgetown University | 1 | 2004 |
| Henry Ford Hospital | 4 | 1987, 2002, 2003, 2012 |
| Indiana University School of Medicine | 4 | 1987, 2002, 2003, 2012 |
| Jackson Memorial Hospital/ Jackson Health System | 3 | 2004, 2008, 2009 |
| Johns Hopkins University | 3 | 1986, 2005, 2009 |
| Loma Linda University Medical Center | 2 | 1989, 2000 |
| Louisiana State University–New Orleans | 2 | 2010, 2013 |
| Louisiana State University– Shreveport | 2 | 1989, 2010 |
| Loyola University Health Systems | 2 | 1989, 2009 |
| Massachusetts General Hospital | 4 | 1980, 1983, 1986, 2001 |
| Mayo School of Graduate Medical Education | 4 | 1985, 1985, 2009, 2012 |
| Medical College of Georgia | 5 | 1955, 1981, 1982, 2000, 2006 |
| Medical College of Virginia | 4 | 1980, 1989, 2011, 2011 |
| Medical College of Wisconsin | 5 | 1986, 2007, 2009, 2010, 2012 |

## Recruitment and retention of women in neurosurgery

| Institution | | Years |
|---|---|---|
| Medical University of South Carolina | 1 | 2010 |
| Mount Sinai School of Medicine | 10 | 1987, 1980, 1981, 1985, 1986, 1987, 2005, 2009, 2012, 2013 |
| National Capital Consortium | 2 | 2000, 2005 |
| National Naval Medical College | 1 | 1985 |
| New Jersey Medical School | 5 | 1986, 2001, 2006, 2010, 2012 |
| New York Medical College | 3 | 1987, 2005, 2009 |
| New York University Medical Center | 4 | 1981, 2006, 2006, 2012 |
| Northwestern University Medical School | 5 | 1984, 1986, 1986, 2001, 2005 |
| Ohio State University | 7 | 1971, 1986, 1980, 1981, 2007, 2010, 2013 |
| Oregon Health & Science University | 3 | 1983, 2006, 2011 |
| Pennsylvania State Medical School | 3 | 2008, 2008, 2011 |
| Rush/Presbyterian/St. Luke's Hospital | 4 | 1985, 1991, 2001, 2002 |
| St Joseph's Hospital & Medical Center | 6 | 1992, 2003, 2007, 2009, 2010, 2012 |
| St. Louis University | 2 | 1999, 2001 |
| Stanford University Medical Center | 5 | 1995, 2000, 2003, 2009, 2013 |
| State University of New York–Brooklyn | 1 | 2003 |
| State University of New York–Buffalo | 4 | 1997, 2004, 2008, 2011 |
| State University of New York–Syracuse | 6 | 1982, 1992, 1999, 2000, 2008, 2010 |
| Temple University Hospital | 2 | 1989, 2005 |
| Thomas Jefferson University | 3 | 1988, 1997, 2009 |
| Tufts–New England Medical Center | 3 | 2001, 2002, 2012 |
| Tulane University School of Medicine | 5 | 1991, 1996, 2000, 2003, 2005 |
| University of Alabama–Birmingham | 3 | 1998, 2004, 2011 |
| University of Arizona | 1 | 2012 |
| University of Arkansas–Little Rock | 0 | NA |
| University of California–Davis | 7 | 1988, 1993, 1994, 1999, 2000, 2006, 2008 |
| University of California–Los Angeles | 4 | 1985, 1998, 2008, 2010 |
| University of California–San Diego | 3 | 1999, 2012, 2012 |
| University of California–San Francisco | 5 | 1994, 1995, 1999, 2004, 2006 |
| University of Chicago | 3 | 1990, 2007, 2013 |
| University of Cincinnati | 2 | 2011, 2011 |
| University of Colorado | 6 | 1991, 1995, 1998, 2002, 2004, 2009 |
| University of Connecticut | 1 | 1992 |
| University of Florida–Gainesville | 4 | 1984, 1993, 2009, 2012 |
| University of Illinois at Chicago | 2 | 1983, 2010 |
| University of Illinois at Peoria | 2 | 1997, 1999 |
| University of Iowa Hospitals | 2 | 2003, 2004 |
| University of Kansas Medical Center | 1 | 2005 |
| University of Kentucky Medical Center | 3 | 1989, 1996, 2008 |
| University of Louisville | 2 | 1994, 2011 |
| University of Maryland Medical Center | 2 | 2001, 2004 |
| University of Massachusetts | 2 | 1994, 1998 |
| University of Michigan | 5 | 2001, 2004, 2007, 2010, 2012 |
| University of Minnesota | 7 | 1988, 1990, 1994, 2001, 2004, 2007, 2011 |
| University of Mississippi Medical Center | 1 | 1991 |
| University of Missouri–Columbia | 3 | 1987, 1995, 2000 |
| University of Nebraska Medical Center | 1 | 2006 |
| University of New Mexico | 1 | 2008 |
| University of North Carolina | 6 | 1981, 1990, 2002, 2007, 2010, 2012 |
| University of Oklahoma Health Science Center | 0 | NA |
| University of Pennsylvania | 6 | 1987, 1996, 2001, 2007, 2010, 2011 |
| University of Pittsburgh Medical Center | 3 | 2002, 2004, 2009 |
| University of Puerto Rico Medical School | 1 | 2006 |
| University of Rochester Medical Center | 1 | 1993 |
| University of South Florida | 2 | 2004, 2009 |
| University of Southern California | 4 | 1986, 1997, 2010, 2013 |
| University of Tennessee–Memphis | 5 | 1994, 1995, 1997, 2000, 2001 |
| University of Texas–Dallas | 5 | 1989, 2004, 2004, 2008, 2010 |
| University of Texas–Galveston | 4 | 1989, 1993, 2007, 2013 |
| University of Texas–San Antonio | 4 | 1989, 1993, 2007, 2013 |
| University of Utah | 9 | 1984, 1988, 1999, 1999, 2000, 2009, 2010, 2011, 2011 |
| University of Vermont | 4 | 1987, 1999, 2007, 2013 |
| University of Virginia | 1 | 2013 |
| University of Washington | 5 | 1999, 2001, 2010, 2011, 2013 |
| University of Wisconsin–Madison | 3 | 1984, 2003, 2007 |
| Vanderbilt University Medical Center | 4 | 1986, 2003, 2009, 2012 |
| Wake Forest University School of Medicine | 1 | 2005 |
| Washington University School of Medicine | 2 | 2006, 2010 |
| Wayne State University | 3 | 1993, 2002, 2006 |
| West Virginia University | 3 | 1993, 2001, 2005 |
| Yale–New Haven Medical Center | 7 | 1999, 2000, 2002, 2005, 2009, 2012, 2013 |

* NA = not applicable.

### References

1. Andrews N: Climbing through medicine's glass ceiling. **N Engl J Med 357:**1887–1889, 2007
2. Ash AS, Carr PL, Goldstein R, Friedman RH: Compensation and advancement of women in academic medicine: is there equity? **Ann Intern Med 141:**205–212, 2004
3. Association of American Medical Colleges (US): **AAMC Professional Development Seminars.** Washington, DC: AAMC, 2007 (http://aamc.org/members/wim/meetings/start.htm) [Accessed 15 October 2007]
4. Benzil DL, von der Schmidt E III: Toward harnessing forces of change: assessing the neurosurgical workforce. **AANS Bulletin 15:**7–11, 2006
5. Bickel J, Brown AJ: Generation X: implications for faculty recruitment and development in academic health centers. **Acad Med 80:**205–210, 2005
6. Bickel J, Croft K, Marshall R: **Enhancing the Environment for Women in Academic Medicine.** Washington, DC: AAMC, 1996
7. Bickel J, Wara D, Atkinson BF, Cohen LS, Dunn M, Hostler S: Increasing women's leadership in academic medicine: report of the AAMC project implementation committee. **Acad Med 77:**1043–1061, 2002
8. Blakemore LC, Hall JM, Biermann JS: Women in surgical

residency training programs. **J Bone Joint Surg Am 85-A**: 2477–2480, 2003

9. Bland KI: The recruitment of medical students to careers in general surgery: emphasis on the first and second years of medical education. **Surgery 134**:409–413, 2003

10. Borman KR: Gender issues in surgical training: from minority to mainstream. **Am Surg 73**:161–165, 2007

11. British Medical Association (UK): **Women in Academic Medicine Report, July 2007**. London, UK: British Medical Association, 2007 (http://www.bma.org.uk/ap.nsf/content/wam2007) [Accessed 21 December 2007]

12. Daniell E: **Every Other Thursday: Stories and Strategies from Successful Women Scientists.** New Haven: Yale University Press, 2006

13. Darves B: New England Journal of Medicine: **Women in medicine force change in workforce dynamics.** Boston, MA: NEJM Career Resources, 2005 (http://www.nejmjobs.org/career-resources/women-in-medicine.aspx) [Accessed 21 December 2007]

14. De Angelis CD: Women in academic medicine: new insights, same sad news. **N Engl J Med 342**:426–427, 2000

15. Dorrance A, Nash T: **Training Soccer Champions.** Fort Collins, CO: JTC Sports, Inc., 1996

16. Etzkowitz H, Kemelgor C, Neuschatz M, Uzzi B, Alonzo J: The paradox of critical mass for women in science. **Science 266**:51–54, 1994

17. Government Affairs Program/American Geological Institute: **Women and Minorities in Science.** Washington, DC: AGI, 2002 (http://www.agiweb.org/gap/legis107/womenscience.html) [Accessed 21 December 2007]

18. Hamel MB, Ingelfinger JR, Phimister E, Solomon CG: Women in academic medicine—progress and challenges. **N Engl J Med 355**:310–312, 2006

19. Holdcroft A: Academic medicine: time for reinvention: academic medicine is failing women. **BMJ 328**:46, 2004

20. Jagsi R, Guancial EA, Worobey CC, Henault LE, Chang Y, Starr R: The "gender gap" in authorship of academic medical literature—a 35-year perspective. **N Engl J Med 355**:281–287, 2006

21. Jonasson O: Leaders in American surgery: where are the women? **Surgery 131**:672–675, 2002

22. Mayer KL, Perez RV, Ho HS: Factors affecting choice of surgical residency training program. **J Surg Res 98**:71–75, 2001

23. Morahan PS, Voytko ML, Abbuhl S, Means LJ, Wara DW, Thorson J, et al: Ensuring the success of women faculty at AMCs: lessons learned from the National Centers of Excellence in Women's Health. **Acad Med 76**:19–31, 2001

24. Morton MJ, Sonnad SS: Women on professional society and journal editorial boards. **J Natl Med Assoc 99**:764–771, 2007

25. Nonnemaker L: Women physicians in academic medicine: new insights from cohort studies. **N Engl J Med 342**:399–405, 2000

26. Stratton TD, McLaughlin MA, Witte FM, Fosson SE, Nora LM: Does students' exposure to gender discrimination and sexual harassment in medical school affect specialty choice and residency program selection? **Acad Med 80**:400–408, 2005

27. Venes JL, Parent AD: Women in neurological surgery. Matson Memorial Lecture. **J Neurosurg 104**:227–232, 2006

28. Wendel TM, Godellas CV, Prinz RA: Are there gender differences in choosing a surgical career? **Surgery 134**:591–598, 2003

29. Woodrow SI, Gilmer-Hill H, Rutka JT: The neurosurgical workforce in North America: a critical review of gender issues. **Neurosurgery 59**:749–758, 2006

30. Wright AL, Ryan K, St Germain P, Schwindt L, Sager R, Reed KL: Compensation in academic medicine: progress toward gender equity. **J Gen Intern Med 22**:1398–1402, 2007

31. Wright AL, Schwindt LA, Bassford TL, Reyna VF, Shisslak CM, St Germain PA, et al: Gender differences in academic advancement: patterns, causes, and potential solutions in one US College of Medicine. **Acad Med 78**:500–508, 2003

Manuscript submitted May 30, 2008.

Accepted June 16, 2008.

*Address correspondence to:* Deborah L. Benzil, M.D., 280 North Central Avenue, Suite 235, Hartsdale, New York 10530, email: benzilneurosurg@aol.com.

## **AFFIDAVIT OF LORA ROBERTS**

BEFORE ME, the undersigned authority, personally appeared Lora Roberts, who,

being by me duly sworn, upon his oath, stated as follows:

1.     My name is Lora Roberts. I am over the age of 18 years. I have
       never been convicted of a crime, and I am fully capable of making
       this affidavit. I have knowledge and expertise in the area of
       neurosurgery recruitment, including the effects of an adverse
       action to a neurosurgeon's career. To the extent this affidavit
       provides opinions, they are based on my knowledge, training, and
       experience, and are true and correct based on my knowledge and
       belief.

### *Background and expertise regarding the neurosurgery recruitment process.*

2.     I am a Neurosurgery Placement Specialist.

3.     I have 15 years of experience as a physician recruiter, and
       exclusively recruit and place neurosurgeons.

4.     I am one of three physician recruiters in the US, who focuses
       exclusively on the recruitment and placement of neurosurgeons.
       Of the three, I have been in practice the longest.

5.     I am the Founder and Owner of MedHIRE, the only recruitment
       firm in the U.S. that specializes in the recruitment of
       neurosurgeons and neurologists exclusively.

6.     MedHIRE has gained a first-rate reputation throughout the
       Neurosurgery and Neurology community of physicians. MedHire
       was founded in 1993, is headquartered in St. Louis, MO, and has 3
       full-time executive physician recruiters.

7.     I have extensive experience as a neurosurgical recruiter in both
       academic and private settings, including representing over 180
       neurosurgery and neurology clients and employers. I have spoken
       to hundreds of neurosurgery candidates about their qualifications
       for various positions. I have dealt with a variety of health care
       facilities, physician practices, and other hospital environments.

8.     I have been a member of the National Association of Physician
       Recruiters (NAPR) and MedHire adheres to their standards and
       practices. NAPR, founded in 1984, is one of the oldest national
       associations in recruitment with the mission promoting excellence,

ethical standards, innovation and a spirit of cooperation in the delivery of physician recruitment services to the health care industry.

9.      MedHIRE's specialists have been quoted in national journals as an authority in recruiting in specialized areas such as neurology and neurosurgery.

10.     I have given lectures on the topic of physician recruitment, specifically neurosurgery recruitment.

### *Recruitment of Neurosurgeons*

11.     The field of neurosurgery is very specialized. Recruiting in the academic and private sector of the neurosurgery environment is a competitive and rigorous process.

12.     The neurosurgery community across the US has fewer than 5,000 surgeons. This community is small, close-knit, and communication amongst neurosurgeons is free-flowing.

13.     In my experience, the average time it takes for a qualified neurosurgeon to be recruited, credentialed, and to start practicing neurosurgery is approximately 1 year.

14.     Each state has its own medical licensing process, and each hospital facility has its own rigorous credentialing process. If a physician has to move to a different state, he or she must apply for and obtain a new medical license in that state. This process alone can take up to 1 year.

15.     In my experience, before a neurosurgery candidate is offered a position, the Department Chairman will call his co-chairs, colleagues, and program directors across the country to reference the candidate. This frequently occurs whether or not the reference was specifically provided by the candidate.

16.     Due to the small size of the neurosurgery community, neurosurgeons often rely on "word-of-mouth" references more frequently than written references.

17.     There are currently approximately 500 job openings for neurosurgery positions in the US. Many jobs are located in remote or less desirable regions. Jobs in urban cities or desirable areas are

very competitive, and usually only obtainable by very competitive candidates with flawless records.

## *Current Environment Regarding Female Neurosurgeons in the US*

18.  There are relatively few female neurosurgeons in the US compared to males. There are an estimated 180 certified female neurosurgeons in the US, out of the 4,500 or so total neurosurgeons (Source: *Women in Neurosurgery 2008*).

19.  Of the 100 or so academic neurosurgery departments, there are only a few female neurosurgeons that are chairs or chiefs of neurosurgery departments.

20.  I have seen many female neurosurgeons be held to a higher standard in qualifications, academic background, and education than male neurosurgeons. Often, this disparate treatment is subconscious and subtle.

21.  There is a different standard of behavior between males and females in neurosurgery. When male neurosurgeons are rude, disrespectful, and temperamental, most colleagues will forgive that male neurosurgeon due to the stress and qualifications earned. When a female neurosurgeon demonstrates the same behavior, most colleagues label the females as "difficult", "not a team-player", and "not a good fit". This double-standard has jeopardized many female neurosurgeons careers.

22.  I have seen many female neurosurgeons be subjected to discrimination and retaliation in the workplace.

23.  The current neurosurgery environment is difficult for female neurosurgeons given the sacrifices made to personal lifestyle, treatment in the hospital setting, and general stress of operating on patients' brains and spines.

## *Effects of a Termination on the Career of a Neurosurgeon*

24.  Neurosurgery careers can be crushed in a second either for legitimate reasons such as patient safety, or non-legitimate reasons such as personality conflicts.

25. If a board-eligible neurosurgeon is terminated prior to completing his/her board certification requirements, the neurosurgeon must start over to fulfill the eligibility requirements of completing 12 continuous months and 100 operative procedures in a new facility.

26. A termination is a permanent "black mark" on a neurosurgeon's record. Termination often results in irreparable harm to the neurosurgeon's career and unequivocally limits future employment opportunities.

27. Most medical facilities and practices that are recruiting a neurosurgeon will not consider a neurosurgeon if he/she has been "terminated" from a prior position.

28. When a neurosurgeon is terminated from a prior position for whatever reason, most prospective hiring facilities would question the neurosurgeon's competency and professional conduct, and develop a higher bar to hire that candidate.

29. Female neurosurgeons in particular must fight an uphill battle to secure another neurosurgery position due to a termination.

30. Due to the small size of the neurosurgery community, once a neurosurgeon is terminated, a termination with or without cause is often career damaging or in some cases career-ending.

31. Recruiting and placing a neurosurgeon is complex and labor intensive, even when that neurosurgeon is in good standing. The process requires many steps including obtaining state licensing, hospital credentialing, national reporting, reference checking, and board certification. For a previously terminated neurosurgeon, many of these steps are extremely difficult if not impossible.

32. The credentialing and registration processes are often used as screening tools before the neurosurgeon has even met with a recruiting medical facility or interviewed with a particular practice.

33. Employers usually treat an adverse report in the National Practitioners Data Bank (NPDB) as a "Red Flag" whether the neurosurgeon were a convicted felon or terminated without cause.

34. I have seen neurosurgeons that have been terminated be forced to give up practicing medicine and saving lives, after decades of education, training, and practice. Such neurosurgeons are often relegated to work outside of medicine. It is often impossible to place a candidate into a new position or obtain credentials after

termination and/or reporting to the NPDB or state registration boards.

35. Regarding Dr. Deepa Soni's termination without cause, I believe her termination would be career damaging as it is likely that future employers would not want to interview much less hire her. Reports of termination would question her competence as a neurosurgeon even if her termination was due to political reasons, retaliation, or any other reason not related to her performance as a physician. Employers are obligated to inquire in state and national agencies on physician's histories. All physicians are required to report any termination (even without cause) on most state licensing boards.

Further Affiant Sayeth Not.

_____
Lora Roberts

SUBSCRIBED AND SWORN TO BEFORE ME, on the _____ day of _____. 2008, to certify which witness my hand and official seal.

_____
Notary Public

The Impact of Professionalism on Safe Surgical Care

Distinguished Address

New England Society for Vascular Surgery

September 23, 2006

Boston, Massachusetts

Anthony D. Whittemore, MD

Chief Medical Officer, Brigham and Women's Hospital

Professor of Surgery, Harvard Medical School

Corresponding Author:    Anthony D Whittemore, MD

Brigham and Women's Hospital

75 Francis Street, Boston, MA 02115

For the past seven years, I have served as the Chief Medical Officer and Senior Vice
President for Clinical Affairs at the Brigham and Women's Hospital in Boston. The
hospital provides 750 beds, discharges 56, 000 patients, including 9,000 new little souls,
and carries out 31, 000 surgical procedures each year. There are 13,000 employees
including 3100 nurses and 5500 members of the medical staff. Among the physician
component, there are 2200 active attendings, 1500 trainees (850 in 36 accredited
ACGME programs) and 1600 investigators engaged in primary research endeavors with
$400 million from federal and sponsored sources. The quality "bottom bottom" line is our
1.7 % hospital mortality, which benchmarks against the University Healthcare
Consortium's observed-to-expected ratio at 0.74. It is an extraordinary privilege to help
facilitate the mission of the institution and the objectives of its Department Chairs and
their dedicated staff. However extraordinary, this privilege is fraught with equally
extraordinary challenges, prime among them the assurance of sustainable, safe, yet cost-
effective patient care in the context of increasing volume and acuity. Our President, Craig
Donaldson, friend and colleague for three decades, asked me to deliver a provocative
lecture drawing on this experience. I'll try not to disappoint.

Much has been made of patient safety of late, not that we haven't been promoting safe
care for the entirety of our professional lives. After all, the American Board of Surgery,
charged with certifying "the education, training and knowledge of surgeons", was created

in 1937 through the efforts of the American Surgical Association. President Archibald's address in 1935 underscored that "Fellowship in the American College of Surgeons did not assure sufficient mastery of both the art and science of surgery." (1) His address prompted subsequent deliberations within a committee chaired by Evarts Graham, who, in his own presidential address, declared to the membership "…steps were taken to organize an American Board of Surgery which would certify competent surgeons."(2) We as surgeons have been leaders in the safe conduct of patient care and we need to set the bar once again.

Prominent among recent studies that have provoked heightened awareness and renewed initiatives with regard to patient safety is the IOM report of 1999, "To Err Is Human" (3). One might argue that the two prior studies that informed the report were flawed by design and outdated with numbers now hyperbolic with respect to progress made during the interim. Yet medical errors are real, occur frequently and a single serious error one too many. While our hospital mortality may be 1.7% and seems at face value to be acceptable, this figure represents 935 deaths each year. The vast majority result from the natural history of the underlying disease process, but some small number indeed result from medical errors and an occasional death remains entirely unexplained. These errors most commonly result from the ordering, dispensing and administration of medications, yet there are a multitude of additional sources enabled by several contributing factors, one of which is unprofessional conduct. Not an insignificant part of my charge is the management of errant physician behavior, only occasionally the expression of a major mental disorder or substance abuse. Far more often, these instances derive from

unprofessional abusive conduct, which, while less pathologic, proves equally disruptive. Yet this behavior is frequently tolerated and even rewarded! I'd like to spend a moment describing the rationale underlying an effort we have implemented to address this issue in the name of insuring safe patient care in the context of a comfortable work environment, free from inappropriate and unprofessional behavior. But first, do we really have a problem?

The American Association of Critical Care Nurses in concert with VitalSmarts, LC, carried out a purely descriptive study based upon focus groups, observations and a survey tool in which seven concerns emerged as particularly difficult to deal with, one of which was disrespect. (4) The study documented that the majority of nurses and other healthcare providers had experienced some degree of condescending, insulting or rude behavior, and a third had encountered verbal abuse. The study provided an example that will resonate with most of us:

> "A group of physicians went right into the patient's room without gowns or masks or gloves. This was a patient who was supposed to be in isolation. We didn't confront them because that cardiac surgeon has a reputation. He belittles nurses by saying things like, 'Do they have any nurses on this unit who aren't stupid?' If you question him, he starts yelling, and it turns into a war." (Nurse)

Another example of disruptive behavior recently occurred at a well-known Academic Medical Center. A general surgeon, given to intermittent outbursts of anger based upon

his frustration with the operating room schedule, added a patient to the list late in the day. With the unexpected arrival of a fresh cadavaric kidney, a renal transplant bumped his case. He became agitated and verbally abusive; harassing the nurses in an effort to move his patient into a room at the same time they were rightfully prioritizing their efforts to get the transplant underway. The circulating nurse became so distracted that she neglected to notice that the instrument tray for the back table had not been sterilized. She became aware of her oversight as the donated kidney was being prepared with the unsterilized instruments, but fortunately prior to the recipient's incision: the anticipated recipient disappointed and a valuable kidney lost.

A surgeon with a reputation for disruptive behavior in the operating room regularly intimidated anesthesiologists, nurses and residents. Yet he had some degree of self-awareness and at least recognized his disruptive behavior. After an outburst, he characteristically apologized profusely to all, only to act out again 20-30 minutes later. One morning, a relatively new anesthesiologist was assigned to his operating room in which the first patient required excision of a pheochromocytoma. After the tumor had been removed, the surgeon slipped into his disruptive pattern and verbally abused the anesthesiologist so aggressively that in her distraction she neglected to turn off the Nitroprusside drip. The patient died.

Lest I leave you with the notion so frequently promulgated that surgeons are always the culprits subjected to singular persecution, another example might be the prominent and extremely competent medical subspecialist who became so predictably abusive to

attendings in the Emergency Department and to the residents on the floor they stopped calling him when his patients were admitted to the hospital. This pattern merely escalated the hostility of the environment to the detriment of both patient and care team. This disruptive specialist had been following a patient for years with an arrhythmia known by him to respond to a specific, but unusual intervention. Since he was not consulted initially, the first line standard intervention proved ineffective, resulting in an unnecessary transfer to the ICU for 48 hours of high-risk resource-intensive care.

The notion of disrespectful, disruptive behavior cannot represent a new concept for any of us. Your parents undoubtedly schooled you in the principle that "if you hit your brother you can expect him to hit you back", or if you were ill informed, you soon discovered the general principle on your own! In fact, the Golden Rule, or the ethic of reciprocity, is embedded in most cultures through religious scripture (Table 1). (5,6) In addition, we have statutory obligations under Title VII of the Civil Rights Act of 1964 and our state labor laws. For instance, the General Laws of Massachusetts (Part 1 Administration of the Government: Title XXI Chapter 151B) renders unlawful discrimination because of race, color, religious creed, national origin, ancestry or sex. And there is no shortage of Codes of Conduct: in my case, Brigham and Women's Hospital, Partners HealthCare System, Harvard Medical School, American Medical Association, American College of Surgeons, Association of American Medical Colleges, Joint Commission for Accreditation of Healthcare Organizations, and the Massachusetts Bureau of Registration in Medicine. Yet, in spite of duly codified expectations for professional behavior as articulated by caring parents, religious tenets and institutional

policies, inappropriate unprofessional behavior remains a challenge for all of us in insuring the safe conduct of patient care. In spite of these proclamations, we seem not only to tolerate disrespectful abusive behavior, but also actually reward it in the cases of high revenue rainmakers or some of our more senior staff.

We are certainly not alone in having to deal with disruptive, abusive or unprofessional behavior. Wall Street, the USAF Academy and corporate America, represented by Toyota, Wal-mart and Caterpillar among others, have all encountered claims of discrimination and/or harassment filed with the Equal Employment Opportunity Commission (EEOC). As surrogates for abusive behavior, claims of discrimination and/or harassment are often invoked as the final legal recourse for the abused individual. The common denominators beyond the actual abusive behaviors lie in the employer's failure to deal with these incidents in a timely and transparent fashion and/or the resultant retaliatory component. In July of 2004, the Washington Post reported:

*"The U.S. Equal Employment Opportunity Commission (EEOC) and Morgan Stanley today announced a $54 million settlement of a sex discrimination lawsuit under Title VII of the 1964 Civil Rights Act filed on behalf of a class of female officers and women eligible for officer promotion in the firm's Institutional Equity Division. As part of the settlement, at least $2 million will be provided for diversity programs designed to enhance the compensation and promotional opportunities for female employees within Morgan Stanley. "* (7)

An article in The New York Times during 2003 referenced a 12% incidence of rape or attempted rape among women graduates from the U.S. Air Force Academy, (8) and speaking to 4100 cadets in August of 2004, Commandant Brigadier General John Weida stated:

*"And ladies and gentleman, if you think we don't have a sexual assault or sexual harassment problem at the Air Force Academy. your head is in the sand. Pull it out right now. If you're over here thinking this problem has been blown out of proportion by the media. you are wrong. You are wrong."*(9)

My own institution has not been spared. During the past five years there have been numerous internal complaints from employees and professional staff, which have resulted in 26 claims alleging harassment and discrimination filed with the Massachusetts Commission Against Discrimination (MCAD) or the EEOC. Three of these claims have been filed against specific physicians, and it's worth bearing in mind there is no insurance policy which indemnifies you against court ordered settlements.

Why the heightened emphasis on professionalism? The answer in some part relates to an increased awareness that disruptive behavior may well serve as a surrogate for true impairment from substance abuse or mental illness. At the very least, abusive behavior has detrimental consequences beyond mere annoyance and the potential for litigation. consequences that impact patient safety. Another component of the answer may be an increased incidence of inappropriate conduct resulting from the staggering pace at which

we are expected to administer safe, yet cost-effective care. Imagine Harvey Cushing who was able to call the OR to inform them he had finished his tea and was ready to have his patient taken into the operating room! Our current environment requires us to cope with an increased volume of patients; higher acuity as evidenced by both CMI and Charlson Index; constant pressure to reduce length of stay to generate virtual capacity with which to accommodate that volume; stresses imposed by emerging technology; increased burden of documentation; adapting to electronic systems; reduced reimbursement; higher rates for liability protection.... no wonder fuses grow ever shorter. Physician dissatisfaction is clearly reflected in the Physician Practice Environment Index provided annually by the Massachusetts Medical Society (Figure 1). (10) This index represents an analysis of nine indicators consisting of 1) applications to medical schools, 2) number of physicians over 55, 3) median physician income, 4) ratio of median housing prices to median income, 5) mean number of hours spent on patient care activities, 6) physician cost of doing business, 7) number of visits per emergency department, 8) change in malpractice rates, and 9) number of advertisements for physician employment in the New England Journal of Medicine. The index portrays a gloomy trend.

In 1999, the ACGME endorsed general competencies for residencies and embarked on the Outcome Project. (11) Professionalism is one of the six specific core competencies:

*Residents must demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles. and sensitivity to a diverse population.*

*Residents are expected to:*

- *Demonstrate respect, compassion and integrity; a responsiveness to the needs of patients and society that supercedes self-interest; accountability to patients, society, and the profession; and a commitment to excellence and on-going professional development.*

- *Demonstrate a commitment to ethical principals pertaining to provision or withholding of clinical care, confidentiality of patient information, informed consent, business practices*

- *Demonstrate sensitivity and responsiveness to patient's culture, age, gender and disabilities*

I suppose we ought to understand the strict definition of the term as defined in Miriam-Webster's Dictionary: (12)

Main Entry: **pro·fes·sion·al·ism**
**1**: **the conduct, aims, or qualities that characterize or mark a profession or a professional person**

Main Entry: **pro·fes·sion·al**
**1 a**: of, relating to, or characteristic of a profession **b**: engaged in one of the learned professions **c** (1): characterized by or conforming to the technical or ethical standards of a profession (2): **exhibiting a courteous, conscientious, and generally businesslike manner in the workplace**

We can all recognize the characteristics of professional integrity, which have been nicely summarized from a practical point of view by Dr. Louis Sanchez, Director of Physician Health Services at the Massachusetts Medical Society (Table 2): (13)

Edmund D. Pellegrino, M.D., former Director of the Center for the Advanced Study of Ethics and founder of the Center for Clinical Bioethics at Georgetown University, is Professor Emeritus of Medicine and Medical Ethics, a Senior Research Scholar of the Kennedy Institute of Ethics, and Adjunct Professor of Philosophy at Georgetown. His definition of profession is: (14)

"The voluntary self-imposition of higher than ordinary standards."

For residents to develop this core competency, we as their mentors must lead by example. As David Leach stated at the AMA Ethics Forum six years ago: (15)

"Whether consciously or not, the conduct of attending physicians influences how residents act and behave with colleagues and their patients... Unprofessional behavior is...contagious."

And in a similar vein, Tom Russell wrote in June's issue of the Bulletin of the ACS: (16)

"We must always be aware of the impact our comments and demeanor might have on those who are just starting on the path to a career in surgery."

343e8d334c404072

And I suspect we have all known colleagues, mentors and residents who have exemplified the most egregious behavior, especially in the OR. As I attend symposia and conferences of a very different nature now, and given most CMO's are internists, it seems surgeons are those most frequently cited as behavior problems, acting out inappropriately, but getting away with it. Something there is that loves the high revenue rainmaker, so that not only do we tolerate bad behavior, we are held hostage by it and often unwittingly reward it! I for one am not at all proud of this legacy and I urge you to join in an effort to reward the Professional!

In 2005, we embarked on an institution-wide initiative to educate our staff regarding professionalism and to establish a standard set of expectations for which we could be held accountable. This initial effort in addressing disruptive behavior, adopting standards, represents a first step in a continuum as nicely outlined by Lucian Leape in describing four phases to the process of establishing a model system to effectively deal with both impaired and disruptive physicians. (17) The remaining three steps include the requirements for compliance, monitoring performance and responding to deficiencies.

This initiative required senior management to become fully engaged in developing and implementing educational and workplace professionalism programs. We partnered with consultants from Employment Learning Initiatives and structured a program that initially educated 30 trainers, each of whom readily volunteered from all academic departments and key administrative areas. These trainers, in turn, conduct 2-hour sessions and at

present, after 16 months, have trained 1938 members (57%) of our full time medical staff. The response has been reassuringly positive, even from those initially skeptical, having been cajoled kicking and screaming to the training session. We also created the role of the Professionalism Officer within each academic department selected by the Chair from volunteers. They are required to exemplify professional behavior and create an environment conducive to staff bringing forth any concerns. Their responsibilities include documenting the facts and facilitating appropriate referral to their own Department Chair, the Chief Medical Officer, legal counsel, human resources, or appropriate counseling. Specifically excluded are conducting investigations, interviewing the instigator or witnesses, meeting with the instigator's supervisor or volunteering legal advice.

As the program has been in place for just over a year, it's impact remains unclear. What is perceptible, however, is an enhanced awareness of the consequences of inappropriate behavior and a definite increase in the number of incidents reported by staff to my office, human resources and the offices of patient safety and risk management. There is also an appreciation that any resultant liability is personal and therefore not covered under institutional or malpractice policies. The metrics of success are not necessarily quantifiable, although the number of pertinent complaints and reports to the Massachusetts Commission Against Discrimination, the Bureau of Registration in Medicine and Physician Health Services serve as appropriate surrogates. In addition, by our own analysis at BWH as well as others, it has become apparent that the number of

patient complaints received correlates with interpersonal problems and vulnerability to malpractice litigation. (18)

What is clear is the need to address and resolve workplace issues before they disrupt the hospital environment or escalate to litigation. Physicians must set an example for others in the institution by behaving professionally and respectfully towards all members of the healthcare team, acting in concert with institutional policies and statutory obligations, and by taking action when it comes to your attention that others have not done so.

We are physicians, teachers, and surgeons; let's not lose sight of our obligations as representatives of the highest of profession.

References

1. Archibald EW. Higher Degrees In The Profession of Surgery. 1935; 53:1-15.

2. Graham EA. Samuel Gross Looks In On The American Surgical Association. 1937; 55:1-14.

3. Kohn LT, Corrigan JM, Donaldson MS, Eds. To Err is Human: Building a Safer Health System. Institute of Medicine. Washington, D.C: National Academy Press. 1999.

4. Maxfield D, Grenny J, MacMillan R, Patterson K, Switzler, A. Silence Kills. 2005 VitalSmarts, L.C.

5.World Scripture: A Comparative Anthology of Sacred Texts. Dr. Andrew Wilson, ed. International Religious Foundation, 1991. Available from: http://www.unification.net/ws/theme015.htm Date Accessed: August 16, 2006.

6. Robinson BA. Shared belief in the "golden rule". Ontario Consultants on Religious Tolerance. Available from:

http://www.religioustolerance.org/reciproc.htm Date accessed: August 16, 2006.

7. Masters BA. Wall Street Sex-Bias Case Settled. The Washington Post 2004; July 13.

8. Schemo DJ. Rate of Rape at Air Force Academy 12%. The New York Times 2003: August 29.

9. Emery E. AFA Chief Challenges Cadets' Honor: Weida cites recent scandals, demands restored integrity. The Denver Post 2003; August 29.

10. Massachusetts Medical Society Practice Environment Index. Available from:
*www.massmed.org/mmsindex* Date accessed: August 24, 2006.

11. Merriam-Webster Online.  Available from: *http://www.m-w com/dictionary* Date
accessed: August 24, 2006.

12. Sanchez LT. Fifth Caring for the Caregivers Conference: Physician Health Services,
Massachusetts Medical Society.  December 2005.

13. Joyce B. Introduction to Competency-based Residency Education: 2006 ACGME. A
product of the ACGME Outcome Project: 2006; 19-20.

14. Pellegrino, J. *Neurosurgery 1983; 59:572.*

15. Leach D, Jr. Ethics Forum: Residents should report attendings. American Medical
News 2000: April 10, p.13.

16. Russell, TR. From My Perspective. Bull Am Coll Surg 2006; 91 (6): 4-5.

17. Leape LL. Problem Doctors: Is There a System-Level Solution? Ann Intern Med.
2006; 144:107-115.

18.Hickson GB, Federspiel CF, Pichert JW, et al. Patient Complaints and Malpractice
Risk. JAMA 2002;287 (22):2951-7.

**Table I.** The Golden Rule as expressed in representative religions

| | |
|---|---|
| American Indian | *The Great Law of Peace* |
| Brahmanism | *Mahabharata, 5:1517* |
| Judaism | *Talmud, Shabbat 31a and Tobit 4:15* |
| Judaism / Christianity | *Bible, Leviticus 19.18* |
| Christianity | *Bible, Matthew 7.12 and Luke 6:31* |
| Islam | *Imam "Al-Nawawi's Forty Hadiths"; Number 13* |
| Jainism | *Sutrakritanga 1.11.33and Acarangasutra .101-2* |
| Confucianism | *Mencius VII.A.4 and Analects 15:23* |
| Hinduism | *Mahabharata, Anusasana Parva 113.8* |
| Buddhism | *Sutta Nipata 705 and Udana-Varga 5:18* |
| African Traditional | *Yoruba Proverb (Nigeria)* |
| Taoism | *Tao Teh Ching, Chapter 49* |

**Table II** - Characteristics of Professional Behavior

–Competent
–Available
–Punctual
–Good Listener
–Respectful
–Communicative
–Empathetic
–Reassuring
- Personally Responsible
    –Well; Illnesses and problems addressed
    –Copes with stress
    –Self-aware
–Able to get along with others

Figure 1. Massachusetts Medical Society Physician Practice Environment Index
demonstrates steady decline in percent of physicians satisfied with their work
environment.

